UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOE DASILVA, JR.,             )   Civil No. 20-11358
                              )   Hon. Mark A. Goldsmith
          Plaintiff,          )
v.                            )
                              )
CHRISTINE WORMUTH,            )
Secretary of the Army, and    )
MARTIN POTTER, in his         )
individual capacity           )
                              )
          Defendant.          )
_____)


DEPOSITION OF JOE DASILVA, JR.


DATE:            Wednesday, September 7, 2022


TIME:            10:00 a.m. to 4:27 p.m.


FACILITATED BY:  Free State Court Reporting


PURSUANT TO:     Notice by counsel for the Defendant for

                 purposes of discovery, use at trial, or

                 such other purposes as permitted under

                 the Federal Rules of Civil Procedure

                 and Federal Rules of Evidence


REPORTED BY:     JEREMY TIEKING

1      Q.  Did you review any recordings or video footage or

2   audio recordings in preparation for your deposition

3   today?

4      A.  No.

5      Q.  Are there any audio or video recordings that

6   pertain to your lawsuit?

7      A.  Yes, I think so.

8      Q.  Okay.  What are those?

9      A.  The one with the director, that's it.

10     Q.  And when you refer to the director, who is that?

11     A.  Our boss, our big director in charge of the fire

12  chiefs and --

13     Q.  What's his name?

14     A.  Director Art Young, Arthur J. Young.

15     Q.  And is that the video that you've produced in

16  this case?

17     A.  Video?  No, it's not a video.

18     Q.  Or aud -- an audio recording?

19     A.  Yes, sir.

20     Q.  That you produced?

21     A.  Yes, sir.

22     Q.  Okay.  Are there any pictures or photographs that

23  pertain to the lawsuit?

24     A.  Not that I'm aware of.

25     Q.  Other than your attorney, did you discuss your

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 57

1    remember.  I'd have to look over it.  I have started

2    making some notes of how I was being treated and how

3    other people on shift that worked under Chief Potter's

4    supervision were treating me differently too.  So, I

5    don't have it with me.

6        Q.  Have you given it to your attorney?

7        A.  I have not.  I don't even -- if I can even find

8    it, but I have taken notes.  I don't even know what I did

9    with them personally.  I have taken notes for sure, I

10   just don't know what I did with him.

11       Q.  Okay.  Can you please give those to your

12   attorney?

13       A.  Yeah, if I can find them.  Like I said, I don't

14   know where they're at or locate them, but I'll do my best

15   to try to find them.

16       Q.  Okay.  We'll hold open the deposition pending

17   receipt of those notes which would certainly be covered

18   under the discovery request that we prepended.

19       A.  Uh-huh.

20           MR. ALTMAN:  If he can locate them.

21           THE WITNESS:  Yeah.

22           BY MR. ANCHILL:

23       Q.  Let's talk about the civilian positions you've

24   had with the Army.  When did you start working for the

25   Army as a civilian employee?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 58

1    A.  I don't -- I'm not good with -- I don't remember

2    the exact month, but it was 2000, I think.

3    Q.  Okay.

4    A.  I don't remember.

5    Q.  What was your position when you first started?

6    A.  Emergency Medical Technician.

7    Q.  How long did you serve in that position?

8    A.  Oh boy.  I wish I'd have brought my resume.  It

9    was a couple years then I went into the term firefighter

10   position.  That's all I remember.  Like I said, if I had

11   my resume, I don't exactly remember exact dates.  I know

12   I started in 2000 as a term EMT, then I went to term

13   firefighter, then I went to --

14   Q.  Do you remember approximately when you went to

15   term firefighter?

16   A.  I don't know, maybe a year and a half or two

17   years as an EMT.  Like I said, I don't have my resume in

18   front of me.  That would be great if I had that.  I can

19   just give you the closest dates that I can.

20   Q.  Is the resume that you've produced in this case

21   accurate?

22   A.  I don't even remember what I've produced in this

23   case.  Did I produce one?  I don't even remember.

24   Q.  You did.

25   A.  Okay.  It could be.  It should be.  Should be as

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 59

1    accurate.

2        Q.  Okay.

3        A.  Then I went to a security guard.

4        Q.  Okay.  What were your dates of service as a

5    security guard?

6        A.  Not long.

7        Q.  Years are okay?  Was it 2002 to 2003 roughly?

8        A.  Yeah, 'cause I -- yeah, something like that, and

9    then I went from security guard to police officer, and

10   then I went to the fire station I think in 2007.

11       Q.  How long did you serve as a police officer?

12       A.  Four years, I think.

13       Q.  2003 to 2007?

14       A.  Something like that.  I don't have the exact

15   month, but yeah, it could be give or take a couple months

16   or whatever.

17       Q.  Were all of those positions, the firefighter

18   position, the security guard position, the police officer

19   position, were all of those at the Detroit Arsenal?

20       A.  Yes, sir.

21       Q.  Have you ever worked anywhere else other than the

22   Detroit Arsenal as a civilian employee of the Army?

23       A.  Yeah, I worked at -- a couple odd jobs here and

24   there.  I used to work at a confined space company in

25   Detroit.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 60

1     Q.  For the Army?

2     A.  No, no, no, no.  I'm sorry.

3     Q.  Let me rephrase.

4     A.  You said --

5     Q.  Yeah, so, as a civilian employee of the Army --

6     A.  Oh.

7     Q.  Have you worked at the Detroit Arsenal the whole

8  time?

9     A.  Yes.

10    Q.  Okay.

11    A.  Yes, yes.  I also had -- I was also a reserve

12  police officer for other cities, you know what I mean,

13  during the time that I was employed at the Detroit

14  Arsenal, correct.

15    Q.  What was your next position after police officer?

16    A.  I went back to the fire department.

17    Q.  Okay.  When did you do that?

18    A.  2007.

19    Q.  What was your job title?

20    A.  Firefighter.

21    Q.  Okay.  What were your job duties?

22    A.  Like you want specifics?  Like firefighter.  My

23  job was a firefighter EMT, provide fire service for the

24  base, provide healthcare EMT for the employees, and

25  everything else that they wanted us to do, clean station,

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 61

1   you know, check out your vehicle.

2       Q.  How long did you serve as a firefighter in that

3   position?

4       A.  Until I got sick.

5       Q.  When was that?

6       A.  January 11th, 2021.

7       Q.  What was the nature of your illness?

8       A.  COVID.

9       Q.  Did you supervise anyone in your role as a

10  firefighter?

11      A.  It's not our job to.

12      Q.  What are the titles of the people above you in

13  the chain of command?

14      A.  Captain, Assistant Chief, Fire Chief, and

15  Director, and then garrison Deputy Assistant, and then

16  garrison manager.

17      Q.  Okay.  Who was -- let's start at the top.  Who

18  was the garrison manager?

19      A.  Can you be more specific of when you want that,

20  sir?

21      Q.  Sure.  Well, in the time that you served as a

22  firefighter, who were the garrison managers?

23      A.  I think we've had three different ones.

24      Q.  Okay, who were they and what were each's

25  approximate years of service?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 63

1      A.   Yeah, Arthur Young has filled in that position.

2   I think Bob Porter has filled in it I think.  A couple

3   different people have filled in as temporary.

4      Q.   And how about the director position?

5      A.   It's always been Mr. Young until he would sit in

6   Deputy garrison, and then what's his name, it's a young

7   guy in one of the buildings that filled in for him, I

8   forgot his name.  I don't remember his name, sir.

9      Q.   Okay.  What are the various activities that occur

10  at the Detroit Arsenal, what is the Detroit Arsenal for

11  someone who is unfamiliar with it?

12     A.   Fire department?  When you say various

13  activities, can you clarify what you're asking?

14     Q.   Other than the fire department, are there other

15  functions on the property?

16     A.   Oh, okay.  We go out and do building inspections,

17  go out and fill -- fill things with water when needed and

18  bury road barriers, we do fire prevention week, do fire

19  alarm testing, road holes.

20     Q.   And those are your duties as a firefighter?

21     A.   Yeah, those are all our duties as a firefighter,

22  yes.

23     Q.   Okay.  You mentioned that you recently retired,

24  correct?

25     A.   Yes, sir.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 64

1    Q.   What was the effective date of your retirement?

2    A.   They said July 7th of this year.

3    Q.   Okay.  When was the last time you were on duty as

4  a firefighter?

5    A.   When I got sick, January 11th, of 2021, sir.

6    Q.   Did you work at a fire -- as a firefighter any --

7  anytime between January 11th, 2021, and -- and the

8  present?

9    A.   No.

10   Q.   Between those dates, January 11th, 2021, and the

11  present, have you received your salary or any portion of

12  your salary?

13   A.   Well, that question is -- the government does

14  weird things.  So, yes, and no.  I received my salary

15  until my time -- 'cause when you get sick on work, you go

16  to worker's comp, and then I think the government goes 45

17  days past that, and then you go into worker's comp.  So,

18  I received my salary to a certain period of time.  I

19  don't know --

20   Q.   Through worker's comp?

21   A.   Then I went on worker's comp, sir, so, yes.

22   Q.   Okay.  So, you --

23   A.   So, yes and no.  I don't know how to answer your

24  question.  Your -- your question is yes and partially no

25  because I received my salary because of how the system

Electronically signed by Jeremy Tieking (501-087-518-8444)                                f4927a5a-79e5-479a-8c66-b3976bf91360

1   is.  You got sick at work, now you go to go through the

2   process of filing your worker's comp paperwork so, you're

3   still collecting where you work, so, I'm still getting

4   paid by the government, and as soon as I found out that

5   hey, you're now on worker's comp, I no longer got paid by

6   the Army or the government or whatever, so, now I'm on

7   worker's comp.  Do you see what I'm saying.

8       Q.  Okay, so -- so, you applied for and received

9   worker's comp?

10      A.  Yeah, yeah.

11      Q.  Okay.

12      A.  Yes.

13      Q.  Before you received worker's comp, did you

14  receive any portion of your salary?

15      A.  Well, yeah, I took sick leave and annual leave.

16      Q.  Okay.

17      A.  Yeah, whatever leave I had.  I had -- I got paid

18  until I didn't get paid, then you know, by then hopefully

19  my worker's comp would kick in.

20      Q.  Okay.

21      A.  So, yes.

22      Q.  And did it kick in by that time?

23      A.  Yeah, I mean, everybody did what had to be done

24  during COVID, but yes.

25      Q.  Was your retirement a disability retirement?

Electronically signed by Jeremy Tieking (501-087-518-8444)

Page 66

1      A.  Yes.

2      Q.  Did the Army assist you in that process of

3   receiving disability retirement?

4      A.  What do you mean by assist?

5      Q.  Did they assist you in any way in the process of

6   getting disability retirement?

7      A.  When you say the Army, you mean my organization

8   where I -- the department?

9      Q.  Correct.

10     A.  Yeah, there was paperwork that had to be filled

11   out, yes.  So, yes.  My department, the Chiefs and

12   whoever was involved helped me get my paperwork lined up

13   and forwarded forward, yes.

14     Q.  When you were out due to COVID, did you suffer

15   long-term effects of COVID?

16     A.  Yes.

17     Q.  Okay.  When you were out due to COVID, were you

18   hoping to get back to work as a firefighter?

19     A.  Of course, of course.

20     Q.  Okay.  Why is that?

21     A.  It's what I love to do.  I've been doing it my

22   whole life.  I love to do it.  I love helping people.  I

23   love doing things.  Of course I wanted to get back to

24   work.

25     Q.  And why were you ultimately unable to return to

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)          f4927a5a-79e5-479a-8c66-b3976bf91360

Page 70

```
 1      Q.  Michael Fern.

 2      A.  Mike Fern, one of the inspectors, yeah.

 3      Q.  How's your relationship with him?

 4      A.  I get along with Mike real well.

 5      Q.  David Olman.

 6      A.  He's the new guy from Hawaii.  Not bad, we get

 7  along.

 8      Q.  Any issues with him?

 9      A.  In the beginning I did, but not now, just casual

10  stuff.

11      Q.  Jonathan Perkins.

12      A.  Yeah, get along with Jon real well.

13      Q.  Is he a firefighter?

14      A.  Yep, one of the firefighters too.

15      Q.  Matthew Holton.

16      A.  Firefighter, yep.

17      Q.  How's your relationship?

18      A.  Get along real good.  Good.

19      Q.  Jeremy Bowie (phonetic).

20      A.  Oh, Bouie, yeah.

21      Q.  Bouie, sorry.

22      A.  Bouie's to himself.  I say hi to him a lot, about

23  it.

24      Q.  Is he a firefighter?

25      A.  He's a firefighter too, yes.
```

                    FREE STATE REPORTING, INC.
                  Court Reporting Transcription
                    D.C. Area 301-261-1902
       FREE STATE REPORTING, INC.
                  Balt. & Annap. 410-974-0947
         Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 85

1   everyone having different feelings, so, I don't -- I

2   don't know.  I have no idea.

3       Q.  What was Martin Potter's reputation at work?

4       A.  Well, the shift that worked with him loved him,

5   the shift that didn't work with him didn't like him.  He

6   was just hardcore, just always expected more of you, and

7   always, you know, so.

8       Q.  Did you say the shift that worked with him liked

9   him?

10      A.  Yeah, we get to pick shifts.

11      Q.  Do you know why -- were you part of the shift

12  that worked with him?

13      A.  Never because I did everything I could to stay

14  away from him --

15      Q.  Okay.

16      A.  -- once all this started because I couldn't work

17  with him because of all this going on since 2008.  I said

18  this has got to stop, so, what I did, I had some

19  seniority in the department, so, I would -- I would get

20  to pick shifts, thank God, because if I had low seniority

21  I'd be in trouble, I'd be working with him.

22      So, what I would do is I would -- when it came time

23  for me to pick shifts I'm like, I wanted to get the days

24  that my wife and I could be off so we can enjoy our time

25  together, but I was limited because the guys that had --

FREE STATE REPORTING, INC.
Court Reporting Transcription
D. C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 88

1    something's going on.  If the fire chief had something to

2    say he'd come out too.  Edwards was always there for some

3    reason.  He was always at roll call.  And then after roll

4    call, you go to the board, find out where you're at on

5    the truck, go sign out your truck, check out your

6    equipment on your truck, do what you got to do.  If

7    you're a driver, you got to pull the truck out, check all

8    the lights.  Wherever you worked on a position, you would

9    check out everything, and then you would check out the

10   ambulance.  You would check out a utility vehicle.  So,

11   you're busy doing a lot of things.  Then you take your

12   break, you have your morning break, and then we'd do some

13   training.  We had a lot of continued education training

14   to maintain our licenses.  And then you go to lunch,

15   you're at lunch, and then afternoon you -- you did

16   training again, and then you were downtime for that.  And

17   then at the end of the day, it's your time, you can go to

18   your bunk, do whatever, or just sit in the kitchen, or

19   the day room, and that was it and you waited for a call

20   like every other department in the country, so.

21       Q.  Okay, so, you just described kind of the daily

22   routine?

23       A.  Yeah.

24       Q.  Okay.  What about the atmosphere though, what was

25   the atmosphere like?  My understanding is that it's not

Electronically signed by Jeremy Tieking (501-087-518-8444)                      f4927a5a-79e5-479a-8c66-b3976bf91360

Page 89

```
 1   like working in a typical office.  Would you agree with

 2   that?

 3        A.  Oh, 100 percent.

 4        Q.  Okay.

 5        A.  I mean, you got a bunch of guys, everybody's got

 6   the alpha male thing, and you know, it was just a normal

 7   day life.

 8        Q.  First of all, is it an all-male workplace?

 9        A.  Yes, it's all male, yes.

10        Q.  Okay.  So, how does that affect the atmosphere?

11        A.  It's good to know who you work with, and that's

12   why you pick the shifts on who you can work with, who you

13   get along with, and it was pretty much okay.  If you

14   wanted to do something, or I always say -- we all had

15   extra duties, I had extra duties.  I was on a bunch of

16   other programs where I had to go and do other stuff, so,

17   I'd be across the building too, because I had to do extra

18   duties that I was assigned to at the time, so, and so,

19   you're pretty much pretty busy until your duties were

20   done, and then you kind of slowed down, unless the chief

21   had something that had to be done right away, then you

22   would focus on and get it done.  We had a lot of training

23   on the computer so we're always on the computer doing

24   training, and then we were limited on computers, so, we

25   had to wait, so.  That was pretty -- I mean, the
```

Electronically signed by Jeremy Tieking (501-087-518-8444)          f4927a5a-79e5-479a-8c66-b3976bf91360

Page 90

1   atmosphere was like any other fire department full of

2   males, you know.

3       Q.  And what is that -- describe that atmosphere, a

4   fire department full of males, what does that mean?

5       A.  I mean, nothing.  We just talked about you know,

6   if somebody gets a new truck, or somebody does this, or

7   somebody went on a vacation they'd tell us about it.  We

8   just talked how it was, what's it like, so, that was it.

9   That was pretty much the atmosphere, so.

10      Q.  Okay.  Do the firefighters consider each other

11  like family or brothers?

12      A.  Yes, yes.

13      Q.  Did you consider your colleagues like family and

14  brothers?

15      A.  Yes.  Just because you didn't get along with

16  somebody doesn't mean you don't put your personal

17  feelings aside.  Like Captain DeArmon, I don't like him,

18  what he said about my wife, but guess what, on a scene or

19  on an accident scene or a thing, all that goes away

20  because we have a job to do, we have to do that.  See

21  what I'm saying?  So, you put that aside.

22      I don't have to like somebody just because I work

23  with him, that's what Chief Edwards told me.  The own

24  fire chief says DaSilva, I don't like you, you just have

25  to work for me. The chief said it in the kitchen in front

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 91

1   of everybody, how do you think that makes me feel because

2   of all this, he said it after this EEO and everything.

3   I'm like wow, this is the fire chief telling me that, and

4   he said it in front of everybody when we were having

5   lunch. "DaSilva, I don't like you, you just have to work

6   for me." I'm like oh great, this is the guy that signs

7   off on my eval, so, that's the fire station. You see

8   what I'm saying.

9       Q. Do you work extended shifts together?

10      A. What do you mean by that?

11      Q. How long are the shifts that you work with

12  firefighters?

13      A. Oh, we do two on, two off, two on, three off.

14  Sometimes you get stuck on overtime, so, you do another

15  day. I think because of the union contract or something,

16  we can't do more than I think 72. I think it's changed.

17  Some guys have done more, but yeah, sometimes you're

18  there three, three days, four days straight.

19      Q. Okay. So, the typical shifts are 48-hours, 72-

20  hours?

21      A. 48-hours, yeah. 48 on, 48 off, then 48 on, 72

22  off, so.

23      Q. Okay.

24      A. But sometimes you get stuck three, four days

25  there in a row.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 92

1      Q.  Are there ever -- are there ever any 72-hour

2   shifts?

3      A.  Yeah, it happens quite a bit.  Yes, it happens a

4   lot.

5      Q.  Do the firefighters eat their meals together?

6      A.  Some do, some don't.

7      Q.  Do they play games with each other?

8      A.  Yeah, some do, some don't, yes.

9      Q.  Watch TV together?

10     A.  Yep.

11     Q.  Watch movies together after hours?

12     A.  Yeah, in a day room, yeah, or we're out there

13  playing cornhole, back of the ladder bay playing

14  basketball, whatever, yeah.

15     Q.  Now, do firefighters sleep at the Detroit

16  Arsenal?

17     A.  I'm sorry?

18     Q.  Do firefighters sleep at the Detroit Arsenal?

19     A.  Yes, sir.  We're there 48 hours.  We sleep, we

20  have a kitchen, and we all have our bunks.

21     Q.  Okay.  Tell us about the kitchen and the bunks.

22     A.  Tell us about what?

23     Q.  The kitchen and the bunks.

24     A.  What do you want to know?  It's a big kitchen,

25  and it's a bunk area where like 12 firefighters sleep,

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 93

1    'cause the opp -- the other 12 are off or whatever.

2        Q.  Do firefighters cook meals in the kitchen --

3        A.  Yeah.

4        Q.  -- together?

5        A.  Well, not all of us are good cooks.  We have a

6    couple good guys that are cooks, so, we'll just you know,

7    figure out hey, we all want to eat together, we're like

8    yeah, we'll have spaghetti, okay, so, I usually go the

9    store, pick up everything they need, and everybody just

10   pays you how much it was, and they cook, and we all eat.

11       Q.  And you mentioned the bunk rooms too that you --

12   that the firefighters sleep in.

13       A.  Yep.

14       Q.  Okay.  Where -- can you describe the bunk rooms?

15       A.  They're just cubicles with a curtain, so, you

16   really have no privacy.

17       Q.  Is there a bed?

18       A.  There's a bed, they're murphy beds.  There's two

19   firefighters in one bunk.  So, when the opposite guy is

20   gone, his bunk comes up, and yours comes down, so.

21       Q.  And you mentioned there was curtains?

22       A.  Yeah.

23       Q.  To separate them?

24       A.  Well, no, walls separate them like a cubical

25   wall, but your door into your bunk is like a little

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 94

1    curtain.

2        Q.  Are firefighters essentially -- do they

3    essentially live together for days on end?

4        A.  Well, yeah, you're there for 48-hours, yes.

5        Q.  Is it like a second family?

6        A.  Yes.

7        Q.  Is there a lot of swearing?

8        A.  Yeah, I ain't going to lie to you, totally.

9    Especially when somebody hurts themself and yeah, you

10   always hear it.  Slam the door, oh shit, fuck, it's like

11   oh, that hurt, you know, that's just --

12       Q.  Okay.  What about swearing just in everyday

13   conversation?

14       A.  Pretty much everybody does it.

15       Q.  Uh-huh.

16       A.  I've done it.

17       Q.  Is there a lot of ribbing?

18       A.  A lot of what?

19       Q.  A lot of ribbing, and joking around between

20   firefighters?

21       A.  I don't understand that word.

22       Q.  Joking around between firefighters.

23       A.  The other word you used.

24       Q.  Ribbing?

25       A.  I don't understand what that means.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 96

1    always happen.

2       Q.  Was there a lot of fire -- a lot of times when

3    firefighters would kind of playfully or make fun of each

4    other in a good-natured way?

5       A.  Sometimes, yeah.

6       Q.  Can you give us some examples of that?

7       A.  I don't have any, I mean, I don't remember them.

8    I don't have any examples to give you, I mean.

9       Q.  You can't think of any examples of joking around

10   with your colleagues, or jokingly playing around?

11      A.  Oh, probably like hey, you bought that truck,

12   why'd you buy a Ford, you should have bought a Chevy, you

13   know Found on Road Daily or Dead, whatever.  I mean,

14   those things, that's what I've heard, you know.  I don't

15   really remember anything.

16      Q.  Okay.  What about arguing or banter?

17      A.  Say it again.

18      Q.  Arguing and banter, was there arguing and banter

19   that occurred?

20      A.  Define banter please, or I don't know what banter

21   means, so.

22      Q.  Okay.  Did firefighters argue with each other

23   ever?

24      A.  Not that I notice.  I mean, there's always --

25   there could have been one or -- yeah, people argue.  They

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 97

1    can't -- but if they're over there arguing, I don't know

2    what it's about, so, yeah, there's probably been

3    arguments, of course, 100 percent.

4        Q.  Have you heard the term station talk?

5        A.  Yes.

6        Q.  What does that mean?

7        A.  I don't know what it means.  It's more like

8    'cause you live there, you know, you know what you can

9    say or can't say.  I don't know, it's like you respect

10   people you know, just like the example of like oh, you

11   drive that truck, you should have bought a Chevy, you

12   know what I mean.  That's the only thing I can think of,

13   or why aren't you out there rolling hose, you know, it's

14   too heavy for you or whatever, I don't know.  That'd be

15   like banter, I don't know.  I don't know what that means,

16   so, that's the best I can give you.

17       Q.  Okay.  Did you ever engage in station talk?

18       A.  Yes.

19       Q.  Can you give us some examples of that?

20       A.  I don't remember my examples.  Same thing, like

21   why'd you buy a Chevy, you know, I've got a Ford, you

22   know, mine's better than yours, or you paid too much for

23   that truck.  We've done that, you know.

24       Q.  Can you think of any examples of you making fun

25   of firefighters or poking fun at firefighters?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)          f4927a5a-79e5-479a-8c66-b3976bf91360

1      A.  No, I don't have any examples of that.

2      Q.  Did it ever happen?

3      A.  Probably, but I don't remember much of it.

4      Q.  Can you give -- can you give some examples of

5   people making fun or poking fun at you in a playful way?

6          MR. ALTMAN:  Objection, form.

7          THE WITNESS:  Say that again.

8          MR. ALTMAN:  You can ans -- you can answer the

9   question, it's just a technical --

10          THE WITNESS:  I don't -- I don't have an answer.

11  I mean, I don't remember.  That wasn't my focus of my

12  job, I'd rather just -- you know.

13          BY MR. ANCHILL:

14      Q.  So, you can't think of any examples of when

15  firefighters would -- or anyone at work would playfully

16  make fun or poke fun at you?

17      A.  Well, most of the people technically made fun of

18  my son, so, I don't want to bring that up, but he's

19  asking.  So.

20          MR. ALTMAN:  Well, if it's your son, it's not

21  you.

22          THE WITNESS:  I know, so, me -- you know, oh

23  yeah, I have guys say you should have gone back to the

24  cop, you'll be -- you're a better cop than you are a

25  firefighter.  People said that to me before.  You know,

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

1    We used to watch her every single morning, all of us.

2       Q.  Did you ever comment that you would bang her?

3       A.  No.

4       Q.  Did you ever comment that you'd hit that?

5       A.  No.

6       Q.  How often did you swear at work?

7       A.  I have no idea.  I can't answer that.  I don't

8    know.  Even if I -- I don't know when I did, or if I did,

9    define swear.  What is swear?  Is shit swearing, is like

10   you see what I'm saying?  When you say swear --

11      Q.  You don't know what a swear word is?

12      A.  Well, everybody can -- a swear word could be a

13   lot to different people.  So, I'm asking you what -- what

14   are you asking me and be more specific in your question.

15      Q.  Do you know what a swear word is?

16      A.  Depends on how -- who you're asking.  So, a lot

17   of things can be a swear word.  So, I'm asking you what

18   you want to know if I've asked, be a little bit more

19   specific please, and I can tell you if I've said it.

20   Everybody's interpretation of a swear word is a lot

21   different.

22      Q.  What are -- what's your interpretation of a swear

23   word?  Say them.

24      A.  Something a kid shouldn't hear.

25      Q.  Yeah, say -- say them all.  Everything that you

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 108

1    consider to be a swear word.

2            MR. ALTMAN:  Objection, form.

3            BY MR. ANCHILL:

4       Q.  Go ahead and say it.

5       A.  Shit, hell, fuck.

6       Q.  Okay.  Anything else?

7       A.  Asshole -- asshole.  Whatever people want to say

8    is a swear word, to me, you know.

9       Q.  Okay.  Have you ever used any of those words that

10   you just named at work?

11      A.  Sure.

12      Q.  How often?

13      A.  I have no idea.

14      Q.  Give us a ballpark.

15      A.  I don't have a ballpark.  I don't have a -- I

16   don't have an idea.

17      Q.  Daily?

18      A.  No.  I mean, you hit your hand, you say oh shit,

19   fuck, I don't know.  You know, how many times you close

20   your hand on the door of the ladder and you do something,

21   or you fall and hurt yourself you swear, not intentional,

22   so.  I couldn't tell you how many times if I even said it

23   at all.

24      Q.  Okay.

25      A.  But I've said it, I have said it.  I'm not saying

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 115

1      Q.  Did you ever do that to John the mechanic?

2      A.  John the mechanic, I don't recall doing that to

3   John.  I'm good friends with John.  So, I don't know.

4      Q.  Have you ever heard of something called the

5   Biggest Loser competition?

6      A.  Yeah, the weight loss thing.  We did it at the

7   fire station.

8      Q.  Tell us about that.

9      A.  It's been so long, I don't even remember.  Just

10   we all agreed to see who can lose the most weight.

11   That's all I remember.

12      Q.  So, would you have a competition about that?

13      A.  Yeah, everybody did, so, that's all I remember.

14   It's been so long.  See who can lose the most weight.

15      Q.  And were there wagers involved?

16      A.  I don't remember if there was wagers, because

17   you're not supposed to wage at the government level, so,

18   I don't remember.

19      Q.  You don't remember whether there -- there was

20   never a wager associated with the biggest loser

21   competition, a weight loss competition?

22      A.  I don't remember.  From what I recall, you

23   weren't supposed to wage anything, but I don't remember,

24   so.

25      Q.  Did food ever serve as the currency so to speak?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 117

1   lose, you know.  It's been so long.  I don't even

2   remember most of the conversations.

3       Q.  Was there a playful back and forth about weight

4   loss competitions between the firefighters?

5       A.  There might have been.  Like I said, I don't

6   really remember the conversations.

7       Q.  Were all the conversations surrounding the

8   biggest loser competition good natured?

9       A.  I think so.

10      Q.  Did anyone ever poke fun at people's weight as

11  part of those competitions?

12      A.  I don't remember.  It's been so long.

13      Q.  When did you first meet Martin Potter?

14      A.  When I -- when I became an EMT I think.

15      Q.  What year?

16      A.  2000, I think, when I got hired there.

17      Q.  What were Potter's job titles over the time

18  you've known him?

19      A.  Firefighter, captain, assistant chief, and fire

20  chief now.  Wait, did we have sergeants or captains or

21  lieutenants?  I don't remember.  There might have been a

22  sergeant and lieutenant there for a short period of time.

23  I don't really remember it.

24      Q.  Tell us about your relationship with him over the

25  years and how it -- how it may have or -- how it may have

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

1      A.  I have no idea.

2      Q.  Was there ever a time when your relationship with

3  him was good?

4      A.  Yeah.  I thought there was a time when the

5  relationship was -- he did -- one thing he did do, and

6  I'll give him credit for was he drilled us on the

7  hydraulics.  He actually -- he taught a class, and he

8  made it understandable.  I thought that was great, so.

9      Q.  What period of time when was your relationship

10  with him good?

11     A.  Well, it was never good because of the way he

12  treated people.  He always degraded you, and laughed at

13  you, and made fun of people, and you know, if you were --

14  the problem is we have our -- the problem is our base is

15  -- our department is -- they have their favorites.  They

16  have people they like, and they have people they don't

17  like, and it's obvious in our department.  You know, and

18  -- and -- and that was it.  I thought -- I thought it was

19  decent, and then it's like you know, started getting a

20  little more intense.  I'm like whoa, this is getting out

21  of hand, so.

22     Q.  Who are the people Potter liked and did not like

23  to your un -- to your knowledge?

24     A.  Well, the guys that he liked are the guys that

25  are probably on his shift.  They always picked his shift

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 124

1    Q.  Did -- did you set Potter up with your sister-in-

2  law on a blind date?

3    A.  Yeah, we went on a blind date.  Sure did.

4    Q.  Okay.  What year was that?

5    A.  I don't remember the year.  I really don't.

6    Q.  Approximately.

7    A.  It was early. I don't have a clue.  That I don't

8  remember.

9    Q.  Did you two go to an art fair together?

10    A.  Yep.

11    Q.  Okay, so, this is what I mean when I say -- when

12  I ask you --

13    A.  Yeah.

14    Q.  -- to tell me about the time when your

15  relationship was good.

16    A.  I forgot about that.  Yep, you're absolute.  And

17  that wasn't good either.

18    Q.  What was your relationship like when it was good?

19    A.  At that -- the problem is that's what it was, it

20  wasn't good, because you know what, that day when he went

21  -- when we went with my wife and her sister and we went

22  on this so-called date, we all got together, all he did

23  is degrade me in front of my wife and my sister-in-law.

24  All he did is made fun and laugh at me, so, technically

25  it wasn't even good.  It was the worst thing I ever did

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 125

1   in my life.  I'm like God, this guy's treating me like

2   shit in front of my own wife and my sister-in-law.

3   That's all he did was degrade me, just make fun of me in

4   front of my wife and my sister-in-law.  And it was fine,

5   I said, we're done.  At that point, and it was early.

6   Like I said, it was really early in my career.

7       Q.  Can you ballpark the year?

8       A.  I can't.  Probably when I came -- I don't know if

9   -- I think it was before -- yeah, it was before I came --

10  it was probably when I was a term, 2002 or 2003, I don't

11  remember exactly.

12      Q.  Okay.

13      A.  No, 2000 -- I think it was 2001.  I don't

14  remember it to be honest with you.  It was a long time

15  ago.

16      Q.  And when he made fun of you and berated you on

17  the date, what did he say?

18      A.  Say that again?

19      Q.  When he made fun of you and berated you on the

20  date, when you were on the date --

21      A.  I mean, just --

22      Q.  -- what did he say?

23      A.  I don't remember exactly the words.  It's been so

24  long.

25      Q.  Sure, but what was the gist?

                    FREE STATE REPORTING, INC.
                    Court Reporting Transcription
                    D.C. Area 301-261-1902
        FREE STATE REPORTING, INC.
                    Balt. & Annap. 410-974-0947
        Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 126

1    A.  I don't remember it.  It's been so long that I

2    never wanted to remember that day again because I felt

3    bad for my sister-in-law, 'cause you know, I really don't

4    remember.  That's the honest to God truth.  I know it was

5    so bad that I was like wow, so.

6        Q.  And do you have a sense for why he did that?

7        A.  No.

8        Q.  Or a belief?

9        A.  Nope, none at all.

10       Q.  Did -- is it accurate to say that you and Potter

11   had a personality conflict going way back to 2002 or

12   2003?

13       A.  I guess.  I don't know what that means.  Explain

14   that.  What do you mean, personality?

15       Q.  You didn't like each other.

16       A.  Oh yeah, we both did -- yeah, totally.  Yeah, he

17   didn't like me, I didn't like him, 100 percent.

18       Q.  Okay.  Do you have a sense for why he didn't like

19   you?

20       A.  I have no idea.

21       Q.  Okay.

22       A.  Because I wasn't one of his boys on his shift, I

23   don't know.  Because I stood up to the -- problem with

24   me, I stood up to the management.  I wasn't scared to

25   question him, so.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
FREE STATE REPORTING, INC.
Balt. & Annap. 410-974-0947
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 133

1  Obviously Potter, right?

2      A.   Yes.

3      Q.   Anyone else?

4      A.   Not that I know of.

5      Q.   Okay.  Another claim that you raise in this lawsuit

6  is a retaliation claim, right?

7      A.   Yes.

8      Q.   Okay.  Who retaliated against you?

9      A.   Well, he did because the first EEO.

10     Q.   Potter?

11     A.   And Mr. -- yeah, and Mr. Young too, because they

12 never -- they retali -- it's retaliation and reprisal from

13 the first EEO complaint that the sexual statements of me

14 wearing a B-size bra would stop as of today.  We signed that

15 contract.  We signed that agreement and it continued, so

16 that's where that comes from.

17     Q.   Okay, so, right now I'm just looking for a list of

18 names.  So, the two people who retaliated against you are

19 Potter and Young, right?

20     A.   Yes.

21     Q.   Anyone else?

22     A.   No, sir.

23     Q.   Okay.  What did Potter do to retaliate against you?

24     A.   From when, what time, what are you asking me like

25 when?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 137

1     Q.   What else if anything?

2     A.   From what I recall that he was not going to support

3  me in anything.  He was no longer going to support me in

4  anything I wanted to do.  He told me to my face.

5     Q.   What did he not support you in?

6     A.   He usually writes me a reference letter if I want to

7  look for something, do whatever, and he says he's going to

8  stop doing that be -- he told me I'm going to stop doing that

9  because you're not a team player.  He says you had other

10 options.  You should have went a different route.  I'm like

11 wow, okay.  So, that was it.

12    Q.   Okay.  Anything else Young did to retaliate against

13 you?

14    A.   Nope.

15    Q.   Okay.  Did you ask him for a reference letter that

16 he denied giving you?

17    A.   Yep.

18    Q.   Okay.  What was the reference letter for?

19    A.   I was going to go apply for a part time position.

20 He said nope, we're done.  I said okay, so.

21    Q.   We discussed earlier a sex discrimination claim

22 against Potter.  What did Potter do?  Strike that.  Let's get

23 into your hostile work environment claim.

24    A.   My what?

25    Q.   Your hostile work environment claim.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 142

1      A.    Okay.

2      Q.    So, when is the first time he said -- he said that

3  you should wear a B-sized bra?

4      A.    That was in 2008.

5      Q.    Okay.  What did he say?

6      A.    He just said it.  So, I bet you can wear a B-sized

7  bra.

8      Q.    Okay.  Who observed that?

9      A.    Back then, I don't have a clue.  I don't remember.

10     Q.    What was the context of the conversation?

11     A.    I don't remember.

12     Q.    What did you say after he said that?

13     A.    I have no idea.  I don't remember, sir.  It's been

14  so long.

15     Q.    Okay.  What is the next hostile act that contributes

16  to your hostile work environment claim?

17     A.    When I requested training from 2008, the next one, I

18  used to request training.  Like I said, they'd send -- I

19  remember they sent Fern and Beal to -- we were all

20  firefighters at the time, they got to go to driver operator

21  school.  I didn't get to go, and I requested, oh, we have no

22  money for you.  And then when those guys got their

23  certifications, they got promoted, and they got a step

24  increase grade before me.  I was like wait a minute, why

25  wasn't I offered this?  So, that's something that started it

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 143

1   too.

2       Q.   Okay.  When -- when were you denied the driver

3   operator training?  What year?

4       A.   I don't remember what year.  That was probably 2009

5   or '10.  I don't remember when it was.  It was right after

6   that.  I mean, it was whenever we were all trying to get our

7   cert -- certifications, so.

8       Q.   Okay.  What is the next act that you contribute --

9   that you believe contributes to the hostile work environment?

10      A.   My evaluation.  The statements again, hey, I bet you

11  could wear a B-sized bra.

12      Q.   Hang on.  We're going one by one.

13      A.   Oh, okay.  The again, the statement was can you wear

14  a B-sized bra, and that was -- I don't remember when that

15  was, but it was done.  I remember when we were rolling hose

16  'cause we all do our own hose testing, and it was hot

17  outside.

18      Q.   Okay.  So, there was a second statement by Potter

19  that you should wear a B-sized bra?

20      A.   Oh, yeah.

21      Q.   Okay.

22      A.   This was -- this was continuous, I mean.

23      Q.   Okay, now I want to go though each one.  So, you

24  mentioned that there was a second statement that Potter said

25  to you you should wear a B-sized bra.  When did that second

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                          f4927a5a-79e5-479a-8c66-b3976bf91360

Page 144

1   statement occur?

2          MR. ALTMAN:  Objection, form, and misstates his

3   testimony.

4          THE WITNESS:  I don't remember exactly when.  It was

5   -- it was on and off, because like I said, I worked two, off

6   two, and then I'm on vacation for a while, then he's on

7   vacation for a while.  I mean, it continuously happened in my

8   career there, you know.  And like I said, because of our off

9   time, and vacation time, you know, I only worked 15 days a

10  month technically, so, it's not like it happened every day,

11  so, but that was part and then we were rolling hose and doing

12  hose testing, and I remember coming in, who was with my

13  Kumlin, firefighter Kumlin was with me, and we come in, and

14  then Chief Potter had a pencil in his hand and he goes, hey

15  DaSilva, but you can put this pencil -- you know, you can

16  hold it with your -- with your breasts, hold this pencil

17  under with your breasts.  I'm like whoa.  So, that was one,

18  and then --

19         BY MR. ANCHILL:

20     Q.   Did that occur in the same conversation as the B-

21  size -- the second B-sized bra --

22     A.   No, that was a different one.

23     Q.   Okay.

24     A.   Sorry.

25     Q.   We're only discussing the B-sized -- the second B-

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 147

1    about a bra, you wearing a bra?

2         A.    Many times.  I can't give you a number.

3         Q.    Ballpark it.

4         A.    It was just -- I don't have a ballpark.  It was just

5    -- it was done continuously until the 2018 that it stopped

6    because that's when I filed the SHARP complaint.  So, it was

7    a lot of times. I don't have a number, but it was definitely

8    a lot of times.

9         Q.    Did you ever tell him to stop saying it?

10        A.    I said it in my EEO complaint.

11        Q.    Before that, did you ever tell him to stop saying

12   it?

13        A.    No.

14        Q.    Okay.  Did you ever tell him it was unwelcome?

15        A.    In my EEO complaint.

16        Q.    Before that?

17        A.    No.

18        Q.    Okay.  So, after the pencil test comment, what was

19   the next act that you believe contributes to the hostile work

20   environment?

21        A.    Trying to think, it's been so long and so many

22   things have happened.  I don't -- I don't remember anymore

23   other than the -- the next one would be my EEO for my

24   evaluation.  That truly gave me a hostile work environment

25   because I'm already being treated differently, so.

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 156

1   I've got to come to work every day knowing that because I did

2   this and this, they can't even do the right thing to make

3   this even legit.

4       Q.   But you testified earlier that you don't know who

5   made the decision as to what punishment to give Potter.

6       A.   It doesn't matter who made the decision.  I already

7   know the decision was not the proper -- the guidance that the

8   Army requires.  Because if it was me, I'd be out of a job

9   today.  We wouldn't -- I wouldn't be here.  My job -- I would

10  have been fired if this was me.

11      Q.   Okay.  Was all of the harassment that makes up your

12  hostile work environment claim verbal?  Other than the

13  evaluation because that was in writing.

14      A.   Yeah, that was in writing, that was --.  Well, the

15  email I got too.  Are you counting that?

16      Q.   Which email?

17      A.   The email that Chief Potter sent when I sent my --

18      Q.   With regard to the evaluation?

19      A.   With regards to the evaluation.

20      Q.   Yes.

21      A.   Okay, so, you're counting that.

22      Q.   It was all verbal --

23      A.   All verbal.

24      Q.   -- all verbal harassment?

25      A.   Yes.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)   f4927a5a-79e5-479a-8c66-b3976bf91360

Page 157

1      Q.   Okay.

2           MR. ALTMAN:  Is this a good time to break?

3           MR. ANCHILL:  Sure.  Okay.  What do you want, a half

4    hour?

5           MR. ALTMAN:  Yeah, let's try -- wait.

6           MR. KONCIUS:  Do you want to go off?

7           MR. ANCHILL:  Yes.

8           (At 1:02 p.m., off the record.)

9           (At 2:10 p.m., deposition resumes.)

10          BY MR. ANCHILL:

11     Q.   Before the break, we were talking about various

12   statements that Potter made to you that you found to be

13   harassing.  What do you think motivates Potter to make these

14   statements to you?

15     A.   I don't have a clue.

16     Q.   Okay.  Is it -- is it your impression that Potter is

17   intending to joke with you?

18     A.   I don't know.

19     Q.   Okay.  Is there any reason that leads you to believe

20   that Potter is not joking with you?

21     A.   I don't know what somebody --

22          MR. ALTMAN:  Objection, form.

23          THE WITNESS:  Yeah, I don't get how -- I don't know

24   if somebody is joking or not.  I don't -- I can't answer.  I

25   don't know how to answer that, just I don't know.
                    FREE STATE REPORTING, INC.
                    Court Reporting Transcription
                       D.C. Area 301-261-1902
                      Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 158

1          BY MR. ANCHILL:

2      Q.   Okay.

3      A.   You don't know what somebody's thinking or feeling

4   or what they want to say.

5      Q.   Sure, and I'm just asking 'cause you were there, so,

6   I'm just asking about your impression with regard to the

7   things he said.  Did it appear to you that he was trying to

8   joke?

9      A.   I don't know.  I don't think so.  I don't know.

10     Q.   Do you believe that Potter made these statements to

11  you -- when he made the statements to you that he was

12  motivated by sexual desire toward you?

13     A.   I have no idea.

14     Q.   Okay.

15     A.   I don't know.

16     Q.   Do you believe that Potter said these things to you

17  because he doesn't like you?

18     A.   Yeah.

19     Q.   Okay.  And do you have any understanding of why he

20  doesn't like you?

21     A.   Do I have -- do I understand?  My thought, is that

22  what you're asking?

23     Q.   Yeah, your impression?

24     A.   My impression, I would say because I question things

25  like training and why do other people go and I can't go,

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 162

1      A.   Oh, there was more than that.  Did you want those?

2    There was other statements too.

3      Q.   Is there anything we haven't already talked about?

4      A.   Yes.  When I -- he made a statement in the kitchen

5    in front of basically everybody, and I was walking into the

6    kitchen to put a cup into the dishwasher, and when I walked

7    in, the TV was on, he was standing next to the TV.  Chief

8    Tillman was in the -- the little utility closet because a

9    couple of the other guys were just in the kitchen, and they

10   were all laughing, and I came in to put the dishes in.  When

11   I came out, when I turned around to walk out, he's like, hey

12   DaSilva, tell us what it's like to get a breast implant.  You

13   had it, how much does it cost?  I was just like wow.  And I

14   looked at Chief Tillman in the eyes because I was like --

15   'cause that was just the -- it was right there, and I walked

16   completely out.  And that was -- that was the end of

17   everything.  And he said that in front of everybody and the

18   guys were laughing, guys were just -- you know, the other

19   guys were laughing, and I felt like emasculated.  I felt

20   embarrassed.  I felt -- it was horrible, and that's when I

21   went -- I left the station, and I said -- I went right to

22   SHARP.  I went -- I just immediately went to SHARP and I'm

23   like this is it.  I just can't do this anymore and I went to

24   SHARP, and I left.  I couldn't go to the fire chief because

25   he made the statement about my wife in the kitchen before.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 163

1  So, I can't go to that chief because he did the same thing.

2  So, then I didn't -- you know, the director didn't do

3  anything to him, so I went ahead and went right to SHARP,

4  right down to another building, filed my SHARP complaint, and

5  then went to EEO and filed it, and that's where we're at

6  here.  So, that's what was said in the kitchen.

7      Q.   Okay.  Tell us all the comments that were made that

8  you consider to be sexual harassment.  So we have the

9  comments about wearing a bra, correct?

10     A.   The B-sized bra, yep.

11     Q.   Okay.  And you don't know how many times that

12 comment was said?

13     A.   A lot of times.  In many years it was a lot -- it

14 was said a lot.

15     Q.   But you can't give any kind of --

16     A.   I can't but it was just -- it was -- it was -- it

17 was, you know, it wasn't -- it wasn't done every day because

18 I didn't work every day.  So, I'm telling you that, it was

19 done -- it was said more than it should have said.  It was

20 said a lot.  And then --

21     Q.   But you have no idea how many times.

22     A.   Like I said, I worked 15 days a month, you know, I

23 don't see him as much.  I try not to work with him.  I used

24 all my sick leave to stay away from him.  It was said a lot.

25 That's all I know.  The one in the kitchen, that was only one

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                     f4927a5a-79e5-479a-8c66-b3976bf91360

Page 164

1    time because after that they said he had to stay away from me

2    because the investigation was going on.  So, that was only

3    said once.  The wearing a B-sized bra, that was said numerous

4    times, many, many time.  And then to hold a pencil under my

5    breast, that was -- that was only one time.  So.

6         Q.   Okay.  Other than the statements about the bra, the

7    one statement about breast implants, and the one statement

8    about the pencil test, are there -- is there anything else

9    that you believe constitutes sexual harassment?

10        A.   No.

11        Q.   Okay.  Do you believe that Potter is motivated by

12   hostility toward the male gender when he makes these

13   statements to you?

14        A.   Excuse me?  Rephrase that.

15        Q.   Yeah, I'm trying to understand why you believe

16   Potter says these things to you.

17        A.   Why?

18        Q.   Yeah.  Why?

19        A.   I --

20        Q.   What's your impression?  Is he joking?

21        A.   I don't have an impression.

22        Q.   Is he hostile?

23        A.   I can't tell you why somebody does something.  I

24   don't know, sir.  I can't answer that.  I don't know why he

25   did what he did.  I'm sorry, I can't.  I don't know what to

                    FREE STATE REPORTING, INC.
                    Court Reporting Transcription
                    D.C. Area 301-261-1902
                    Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 165

1    answer there.  I don't know the answer.

2        Q.   Do you believe that he's sexually attracted to you?

3        A.   I don't know.  I hope not.

4        Q.   Do you believe that he has general hostility towards

5    the male gender?

6        A.   I don't know, sir.

7        Q.   You mentioned that Edwards made one statement to you

8    regarding your wife.

9        A.   Yes.

10       Q.   Correct?  What do you think motivated that

11   statement?  Do you believe Edwards was trying to make a joke

12   with you?

13       A.   I have no idea, sir.  It was totally inappropriate,

14   totally wrong.  The man doesn't even know my wife.  He had no

15   reason to say that to my wife -- to say --

16       Q.   I understand --

17       A.   Just another form of sexual harassment.  Now it was

18   done by the fire chief.

19       Q.   I understand that it's wrong, but I'm wondering if

20   you had any impression or any belief as to what motivated him

21   to say that.

22       A.   I don't know him.  I didn't know him that long.  He

23   wasn't there long to know him, so, I have no idea why he said

24   it.

25       Q.   Right before he said that statement, did he make a

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 168

1      A.    That's what you're talking about?

2      Q.    The question is --

3      A.    Just --

4      Q.    Yeah, please listen to the question.

5      A.    Okay.

6      Q.    The question is have we discussed all the acts that

7  comprise your sexual harassment claim?

8      A.    (Pausing, reading documents.)  Okay, one thing,

9  sorry.  I'll look one more time.  The only thing I don't see

10 here is my original EEO, that might have more, so, I would

11 say for now, yeah.  But unless I could have a copy of my EEO

12 complaint, the official one, 'cause that one I got more

13 specific I think, so.  So, I'll say that's to the best of my

14 knowledge, yeah, that would be it, sir.

15     Q.    You allege in your lawsuit that Potter discriminated

16 against you by interfering with your request for a transfer

17 or a promotion.  What are all the transfers and promotion

18 requests that you believe Potter interfered with because of

19 discrimination or retaliation?  Just go ahead and list them.

20     A.    Ask me that one more time please a little slower.

21     Q.    Sure.  Do you allege that Potter discriminated

22 against you by interfering with a request that you made for a

23 transfer or promotion?

24     A.    Yes.

25     Q.    Okay.  What transfer or promotion did he interfere

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 169

1    with?

2        A.    They allowed him to interview me.

3        Q.    Was that for the -- the captain position in 2019?

4        A.    Yes, sir.

5        Q.    Are there any other transfers or promotions that you

6    allege Potter interfered with?

7        A.    I thought I requested something else, but I don't

8    remember what it was now.  I don't remember the other one.  I

9    think maybe it was an opposite shift or something.  I don't

10   remember what it was.

11       Q.    And I'm referring to allegations that you make in

12   this lawsuit.

13       A.    Yeah.

14       Q.    Are there any other transfer, promotion requests --

15       A.    It's the interview -- I would say that.  It's the

16   interview.

17       Q.    Okay.  So, the only one you're alleging as part of

18   this lawsuit is the captain position that you were seeking in

19   2019?

20       A.    Yes, that I can recall.  Yes, that's the only one.

21       Q.    How many people were on your interview panel?

22       A.    I don't know, five, six maybe.  I think seven, I

23   don't know.

24       Q.    Who were the people on your interview panel?

25       A.    I don't remember.  Me --

                    FREE STATE REPORTING, INC.
                   Court Reporting Transcription
                      D.C. Area 301-261-1902
                   Balt. & Annap. 410-974-0947

              FREE STATE REPORTING, INC.
            Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 172

1 didn't say why, you know what I mean. I said I'm asking for

2 an individual to be removed before I start the interview

3 process 'cause it's unfair because I have an active going --

4 you know, EEO lawsuit going. Can you please remove the

5 individual? Well, Ms. Kleehammer says business as usual, Mr.

6 DaSilva. We don't care. And I had to sit there and try to

7 do my best on the interview.

8     Q. Okay. So, do you allege that the EEO official

9 Melissa Kleehammer discriminated against you?

10     A. Oh yeah, 100 percent. Yeah, because when I went to

11 her with Chief Edwards comment to my wife, she said to me

12 well, it only happened once. Do you really want to follow

13 through up on it? I'm like really, so yeah, 100 percent.

14     Q. You don't allege any discrimination by Tillman,

15 Ball, or Todd, do you as part of this lawsuit?

16     A. No.

17     Q. Why do you believe that Potter harmed your chances

18 of obtaining the promotion?

19     A. I just -- the guy was just found guilty of sexual

20 harassment, and now you put him on a panel, how do you think

21 anybody -- any normal human being would be like seriously,

22 you're going to put this man on a panel knowing that there's

23 still a lawsuit, and he -- he was just found guilty of this,

24 and -- and of course, that's just -- I'm sorry. The question

25 is just insane. You don't do that. Any normal human being

Electronically signed by Jeremy Tieking (501-087-518-8444) f4927a5a-79e5-479a-8c66-b3976bf91360

Page 174

1     Q.   When you -- if you were asked to identify your

2   weaknesses, do you -- do you recall responding by saying you

3   don't have any weaknesses?

4     A.   I don't remember.

5     Q.   Is it possible that you said in response to that

6   question that you don't have any weaknesses?

7     A.   I don't remember.

8     Q.   Okay.  Were you asked about standards of cover in

9   the interview and how they are used to make decisions?

10    A.   Standard -- I don't even know what that -- I don't

11   remember that.  I don't -- don't remember, so.

12    Q.   Do you know what standards of cover are?

13    A.   No.

14    Q.   Do you know what that is?

15    A.   No, that's why I'm asking.  I don't know what that

16   is, so.

17    Q.   And you don't recall whether or not that -- whether

18   or not that was mentioned in your interview?

19    A.   I don't remember, sir.

20    Q.   Okay.  Who was ultimately selected for the captain

21   position that you were passed over for?

22    A.   I don't remember who got that one that year.  They

23   have so many.

24    Q.   Was it Sean Beal?

25    A.   It might have been Beal, yeah.  I think it was Beal

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 175

1   now that you said it.  It might have been Beal, I don't

2   remember.

3       Q.   By the way, is captain synonymous with lead

4   firefighter?

5       A.   Say that again.

6       Q.   Is the title captain synonymous with lead

7   firefighter?

8       A.   What's that mean?

9       Q.   Are the two -- are the two the same?  Are the two

10  positions referring to the same position?

11      A.   One is a lead.  That's all.  He's not a supervisor.

12      Q.   Okay.

13      A.   So, he's a lead firefighter.  That's all.  He's not

14  a supervisor in any way, shape, or form.  He doesn't

15  supervise, he just -- he's there with us.

16      Q.   Do you believe that Sean Beal was more qualified or

17  less qualified than you for the captain position?

18      A.   Not my job to make that determination, sir.

19      Q.   Do you have a belief?

20      A.   Not with that.  It's not my job to determine who

21  should have got it.

22      Q.   Do you have any reason to believe that you are more

23  qualified than Sean Beal for the captain position?

24      A.   I'm just as qualified as everybody else that

25  interview that day because I made the list like everybody

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 186

1    the lady asked me for.  It was a different EEO office 'cause

2    it wasn't our original one.  So, it was a whole new person

3    that I didn't know because our original EEO office was going

4    through some changes.  So, yeah, it doesn't mean I didn't.

5        Q.    That section of the EEO complaint asks you to list

6    on what basis you believe you were discriminated against and

7    to check the box next to the bases for the discrimination,

8    and you checked national origin and reprisal, but you did not

9    check sex, correct?

10       A.    Well, sex means male or female, so, I'm a male,

11   obviously I'm a male, so, I don't know why I didn't check

12   that.  Like I said, the lady said you didn't -- this is all

13   good, you don't have to go any further.  So, that's just

14   saying I'm a male or female, so.

15       Q.    Let's talk about the factual basis for this EEO

16   complaint.

17       A.    Yes, sir.

18       Q.    In paragraph 'a' you allege that Potter

19   discriminated against you by giving you a successful rating

20   on your performance review instead of an excellent rating on

21   the performance evaluation that you received on February 2nd,

22   2017.

23       A.    Correct.

24       Q.    Can you take a look at exhibit one for a moment,

25   your lawsuit?  Take a look at exhibit 15 please, or I'm

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 187

1    sorry, paragraph 15.

2        A.   Okay.

3        Q.   Does paragraph 'a' of your EEO complaint -- okay,

4    right there, refer to the same performance evaluation as

5    paragraph 15 of your lawsuit?

6        A.   Yes, I think so.

7        Q.   All right.  In paragraph 'b' of the EEO complaint

8    you allege that after you picked up lunch Edwards said to

9    you, "Don't touch my food, DaSilva, do not touch my drink

10   DaSilva, thanks for the Hepatitis C, DaSilva."  Do you see

11   that?

12       A.   Sure do.

13       Q.   Why do you believe Edwards made those comments to

14   you?

15       A.   Chief Edwards was what's that word, he -- what's the

16   phrase, he had a -- not ADD but he was like a perfectionist.

17   He didn't want nobody touching anything or doing anything.

18   His office was like strict, like everything was straight.

19   What's that called?  I don't know what that word is, I'm

20   sorry, but he had this thing where he didn't want people to

21   do anything, and --

22       Q.   Are you referring to some kind of disorder?

23       A.   Yeah.

24       Q.   Like obsessive compulsive or something?

25       A.   Yeah, yeah, that's what he had, and he was like

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 191

1    DaSilva got me written up.  No, you got yourself written up

2    for what you said about my wife.  So, I --

3        Q.   I thought you said you dropped that?

4        A.   No, no.  I still filed the complaint.  I dropped the

5    EEO after I filed it, correct.  I filed the complaint with

6    the director.  The director supposedly wrote him up.  And

7    then I went and filed an EEO, and I said you know what, I'm

8    going to withdraw that because I want to show the department

9    that I'm not you know, a bad person, that I got to live here.

10   That's why he never liked me and that's why he made these

11   statements that he did.  Like he said, don't talk to me, so,

12   I just -- I just got to work with you, you don't -- don't

13   talk to me, I don't like you.

14       Q.   When did he begin ostracizing and ignoring you?

15       A.   Right after I filed the complaint about the

16   statement he made about my wife.

17       Q.   Did he ever ostracize and ignore you before that?

18       A.   I never really talked to him that much other than

19   roll call or something, or kitchen.

20       Q.   In paragraph 'c', you allege that on January 25th,

21   2017, Potter denied you a training course.  What was the

22   training course that he denied you?  Is that --

23       A.   Fire Officer One.

24       Q.   -- Fire Officer One?

25       A.   Yep.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 192

1    Q.   Okay.  Take a look at exhibit one, please, and look

2  at exhibit 14.  Does paragraph 'c' of your 2017 EEO complaint

3  refer to the same incident as paragraph 14 of the complaint?

4    A.   I would say yes.

5    Q.   Why do you believe Potter denied you the training?

6    A.   'Cause I'm not one of his boys.  I'm not one of the

7  guys that you know, always -- that he liked.

8    Q.   And why didn't he like you?

9    A.   I don't know.

10   Q.   Okay.  Do you -- who decides whether a training is

11 approved or not?

12   A.   I mean, I think there was one point we had a

13 training chief, but that didn't last long.  The chiefs do.

14 They all get together or something.  They talk from what I'm

15 aware of.

16   Q.   Was Potter a chief at the time?

17   A.   He was assistant chief, yeah.  He had say in it too,

18 so.

19   Q.   How do you know he had a say in it?

20   A.   Because he's the assistant chief.  That's who you go

21 to get training.  All these -- you have to go through your

22 chain of command and get it, so.

23   Q.   Do you know who made the decision on that training,

24 whether to approve it or deny it?

25   A.   I don't remember.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 194

1    Q.  In paragraph 'd' of the 2017 EEO complaint you

2    allege that on January 6th, 2017, Edwards said to you in

3    front of your peers, "DaSilva, I don't like you, I just have

4    to work with you".  Take a look at exhibit one again, which

5    is your lawsuit.

6    A.  Uh-huh.

7    Q.  Does paragraph 'd' of your 2017 EEO complaint refer

8    to the same incident as paragraph 13 of your complaint?

9    A.  You said 'd', okay.  Yeah, about the same, yep.

10   Q.  Who are your peers who observed this?

11   A.  Who are my peers?

12   Q.  Yeah, so, I'm sorry, let me rephrase that question.

13   Who are your peers who observed the statements that -- the

14   statement that Edwards made, "DaSilva, I don't like you, I

15   just have to work with you"?

16   A.  I don't remember who was there.  There was people

17   there that witnessed it and made statements about it.  I

18   don't remember who they all were, sir.

19   Q.  In paragraph 'e' of the 2017 EEO complaint you

20   allege that Potter would say to you from time to time during

21   lunch or dinner, "Put on a bra, you ought to wear a 38B".

22   Have we already discussed all the times that Potter made

23   those comments to you involving a bra?

24   A.  Did you say have we already --

25   Q.  Have we discussed that before, all the times that

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 195

1   Potter made those statements to you?

2       A.   Have we discussed it?  Yeah.  I think we went from

3   2018 to when this got filed, yes, then it stopped, correct.

4   So, yes.

5       Q.   On any occasion when Potter made that statement to

6   you, did you -- were you joking -- strike that.

7       Have you ever poked fun or jokingly made fun of Potter's

8   stomach?

9       A.   I don't recall, don't remember.  I don't remember.

10      Q.   Is it possible that you did?

11      A.   I don't remember.  I don't know.  If you have a

12  timeframe or if you have something that you could show me to

13  refresh my memory, I could --

14      Q.   I'm asking ever.  Is it ever -- is it ever possible

15  --

16      A.   I don't --

17      Q.   Is it possible that you ever playfully poked fun at

18  Potter's stomach?

19      A.   I don't remember, sir.

20      Q.   Is it possible that immediately before he made a

21  comment to you about a bra that you had jokingly made fun of

22  him or poked fun at his stomach?

23      A.   I don't recall ever.  Like I said, if there's

24  something that you can show me to recollect my memory, I

25  don't remember anything.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 196

```
 1      Q.   Did you ever make fun of or poke fun at his stomach
 2   during a weight loss competition or a biggest loser
 3   challenge?
 4      A.   I might have.  I don't remember to be honest with
 5   you.  Now you're kind of telling me something, yeah, the
 6   weight loss thing, I might have.
 7      Q.   And is that what triggered Potter to then say well,
 8   you ought to wear a bra?
 9      A.   I don't know sir if that's what triggered it.  That
10   I don't know.
11           MR. ALTMAN:  One second.
12           (Brief pause in proceeding.)
13           BY MR. ANCHILL:
14      Q.   All right, on exhibit three, please flip to page
15   DEF-730 and 731.  It's in the lower righthand corner.  You
16   and the Army entered into a settlement agreement to settle
17   your 2017 EEO complaint, right?
18      A.   Yes.
19      Q.   Is that your signature on that agreement?
20      A.   Yes, sir.
21      Q.   You signed on March 16, 2017?
22      A.   Yes, sir.
23      Q.   Under paragraph A of the agreement it says that the
24   Army agreed to conduct an inquiry into Edward's alleged rude
25   and discourteous behavior towards you.  Do you know one way
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                f4927a5a-79e5-479a-8c66-b3976bf91360

Page 203

1   report of your SHARP complaint?

2       A.   I don't remember, sir.  This could be it.  I don't

3   remember exactly, 'cause she took notes, and I don't remember

4   the whole thing, how it went.

5       Q.   Okay.  Well, does this report reflect the substance

6   of your complaint?

7       A.   I -- from what I'm looking at, yes.  I don't know

8   why it's commander critical information requirements.  I

9   don't remember if that's what was part of SHARP, sir.  This

10  could be it.  So.

11      Q.   So, the question is, does -- does the -- does the

12  substance of this complaint -- does the substance of what's

13  in this document reflect your complaint?

14      A.   Yes.

15      Q.   So, you filed the SHARP complaint because on April

16  3rd, 2018, Potter asked you how much do breast implants cost,

17  correct?

18      A.   Yes.

19      Q.   Okay.  And is that what Potter said?  Let me ask it

20  like this, what did Potter say?

21          MR. ALTMAN:  Asked and answered, objection, sorry.

22          MR. ANCHILL:  It might have been.

23          MR. ALTMAN:  That's -- I mean, answer.

24          THE WITNESS:  It was four years ago, I, you know, I

25  don't exactly, it was something to that.  If I can read it

                    FREE STATE REPORTING, INC.
                   Court Reporting Transcription
                      D.C. Area 301-261-1902
                    Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 205

1    Q.   When Potter made the statement, did it seem like he

2  was joking?  And I understand you didn't consider it a joke,

3  but did it seem like he was trying to joke?

4    A.   I never thought of that.  I didn't pay attention to

5  that, 'cause when he said it to me in front of everybody,

6  people laughing and everything, it just -- I didn't take it

7  as anything.  I just took it as like holy cow, and I walked

8  out.  So, I -- no.  I didn't know how to respond to that.  It

9  didn't seem it was anything.

10    Q.   Okay.  So you don't know one way or another whether

11  he --

12    A.   No.

13    Q.   -- was joking?

14    A.   Nope.

15    Q.   Okay.  Was he laughing when he said it?

16    A.   I don't remember.

17    Q.   Okay.

18    A.   How can you be laughing and making a statement?  You

19  can laugh after the statement.  So, I don't know if you can

20  complete a sentence and laugh.  I think you can laugh after

21  you make the statement.  So, no, he wasn't laughing 'cause

22  how do you laugh while you're trying to make a sentence.

23    Q.   Okay, did he --

24    A.   You can laugh after, you know what I mean?

25    Q.   Did he laugh after?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                              f4927a5a-79e5-479a-8c66-b3976bf91360

Page 207

1    says that -- I'm referring to exhibit four, says, "Potter was

2    told to refrain from these comments, and according to

3    firefighter DaSilva, he has, but he also doesn't work with

4    him very -- that frequently."

5        A.    This is in this report, sir?

6        Q.    Yeah.

7              MR. KONCIUS:  Right about where your hand is if that

8    helps you.  It's in that entitled BLUF, do you see that?

9    Right up -- right up above there, the longer paragraph.

10             THE WITNESS:  Okay.

11             MR. KONCIUS:  Do you see that?

12             THE WITNESS:  Okay.

13             MR. KONCIUS:  That's where he was reading from just

14   to have you not have to look all over that document.

15             THE WITNESS:  So ask your question again, sir.

16             BY MR. ANCHILL:

17       Q.    Sure.  So, the document says, "Potter was told to

18   refrain from these comments, and according to firefighter

19   DaSilva, he has, but he also doesn't work with him that

20   frequently."

21       A.    Correct.

22       Q.    The question is just is that an accurate statement?

23       A.    After the E -- yes.  That's after that.  He had to

24   because they were doing an investigation.  Actually, they

25   moved him out of shift.  They moved shifts.  They put him in

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 208

1   different shifts where I really had no contact whatsoever.

2   We were supposed to stay away from each other.  We didn't eat

3   in the kitchen, and -- and that's what threw the guys off,

4   because when I was sitting in the kitchen, 'cause the guys

5   are there, and the guys were like why isn't Chief Potter

6   eating in the kitchen?  He eats with us in the kitchen all

7   the time.  Then they all kind of looked at me, and I'm like

8   uh.  They kind of have an idea why.  So, yeah.  So, yeah, it

9   stopped because it had no choice because the investigation

10  made him stop and keep him away from me.  So, yes.

11      Q.   Okay, but prior to the investigation, had he -- was

12  there a period of time -- prior to you filing your SHARP

13  complaint, was there a period of time in which Potter stopped

14  making those kinds of statements to you?  'Cause I think

15  that's what this statement is saying.  But let me just ask

16  you.  Was there a period of time before you filed your SHARP

17  complaint when Potter stopped making statements to you that

18  you consider to be of a sexual nature?

19      A.   No, I mean it continued from like I said from 2008

20  until I filed this huge complaint.  When I filed the SHARP

21  and the EEO, that's when things really stopped but before

22  that, all the way to 2008 it just periodically happened.

23      Remember, I had to pick different shifts.  I took leave

24  not to be around him.  So, I did everything I could to be

25  away from him, so he didn't have to say it anymore 'cause I

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 209

1   was nowhere around for him to say it.  When I saw him in roll

2   call every morning I'd just go leave and do what I had to do.

3   So, but after this it did stop.  Yes, it did.

4        Q.   And after your SHARP complaint, did it -- did it

5   stop forever?  Was there ever any --

6        A.   No, it stopped forever.  It was done.

7        Q.   Okay.

8        A.   It was done.  Yes, sir.

9        Q.   Was the basis -- I think you already testified to

10  this, but was the basis for your SHARP complaint the one

11  comment that's in there about the breast implants?

12       A.   It's not -- yeah.  What do you mean basis?  Like it

13  was everything.

14       Q.   That was why you filed the complaint was because of

15  the breast implant comment.

16       A.   Well, it was because of all of them, but this just

17  added to the list.  It's to the point to where it's like I

18  can't take it anymore.  This has got to stop.  So, it was

19  everything combined but that one, it was just finally too

20  much for me, and that's when I decided to go to SHARP and

21  EEO.

22       Q.   Were you interviewed as part of the investigation?

23       A.   Yes.

24       Q.   Okay.  Do you know whether others were interviewed?

25       A.   Yes.

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 212

1   share that information with you?

2       A.   Oh no.  Mr. Young was the way he was because he was

3   mad because I filed the EEO.  You could hear it in his voice.

4   You could see it in his voice.  You know, he was like you had

5   other options, and the way he said it, he was like intense.

6   I was like yeah, but you know.  It was just horrible, so.

7       Q.   Did --

8       A.   He discriminated against me.  I think that's why he

9   didn't do what he was supposed to do punishment wise unless

10  he wasn't the one making the decision.

11      Q.   When you refer to the way that Young's voice was

12  toward you, and you know, him being -- you believe that he

13  was mad at you for filing the complaint, is it -- are you

14  referring to what was expressed in the conversation that you

15  recorded with him?

16      A.   Yes, that too, and what he told me, yes.

17      Q.   Okay, but what you're referring to is all recorded

18  on -- on the -- on your -- on the recording, right?

19      A.   Yes.

20      Q.   There's nothing else that he said to you that --

21      A.   He said plenty of things.  You'd have to remember

22  it.  Something like I'm not a team player.

23      Q.   This is on the recording in that same conversation?

24      A.   On the recording, yes.

25      Q.   Okay.  Who conducted the 15-6 investigation?

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 213

1      A.   A gentleman from another organization.  I think his

2  name was Bob Porter.

3      Q.   Okay.  Do you allege that he discriminated or

4  retaliated against you?

5      A.   No.  I think he did a fair job.

6      Q.   Are you aware that the 15 and 6 -- the 15-6

7  investigator found that everyone harassed everyone?

8      A.   No, I'm not aware of that.

9      Q.   Okay.  Do you have a reaction to that?

10     A.   That doesn't mean anything to me.  I'm worried about

11 my case.  I didn't care what anybody did with everybody else.

12 That's not part of my case.  So, I didn't -- I didn't have

13 anything -- not everybody sexually harassed everybody because

14 there'd be more complaints.

15     Q.   Do you agree that everyone made comments to each

16 other you know, similar to the comments that Potter made to

17 you?

18     A.   No, I've never heard it from anybody else ever in

19 the 20 something years I've been there.

20     Q.   I'm not saying those exact comments but comments

21 like that.

22     A.   Well, you asked me if the comments like that, no,

23 I've never heard anything like that towards anybody.  I've

24 never heard of it, sir.

25     Q.   Have you heard of similar comments?

Electronically signed by Jeremy Tieking (501-087-518-8444)          f4927a5a-79e5-479a-8c66-b3976bf91360

Page 218

1      A.   I'd wanted to -- I'd like to have known that, yes.

2      Q.   Okay.  Why were you so intent on learning that

3   information?

4      A.   To make sure that it was done right because

5   management hasn't done anything right for a long time, and I

6   just wanted to see if they were going to do the right thing.

7   That's it.  I just wanted to know.

8      Q.   Well, they did the right thing here, because the

9   harassment stopped after this, didn't it?

10      A.   Well, it had to stop because he had no choice.  So,

11   they didn't do the right thing.

12      Q.   So the investigation worked?

13      A.   To a degree, but no, they didn't -- that's not that

14   it means that it's right.  They didn't do the right thing.

15   You know, it had to stop or else --

16      Q.   Why did you file the sexual harassment complaint?

17      A.   Because I got tired of being treated that way all

18   the way through my career, 2008.  It was just to the point to

19   where I can't take it anymore.

20      Q.   What was your goal in filing it?

21      A.   My goal?  There is no goal.  It's to leave me alone,

22   let me do my job, do the right thing.  That was it.

23      Q.   And that happened, right?  'Cause the harassment

24   stopped?

25      A.   No, it didn't happen.  The harassment stopped, but

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 219

```
 1    it doesn't mean that what they didn't do. They didn't do the

 2    right thing.  They didn't -- they didn't completely do the

 3    right thing.  Yeah, the harassment stopped 100 percent, yeah.

 4        Q.   And the reason why they didn't completely do the

 5    right thing is because Potter didn't get harsher discipline?

 6        A.   Didn't get what?

 7        Q.   Harsher discipline, correct?

 8             MR. ALTMAN:  Objection, argumentative.

 9             THE WITNESS:  What's that word, partial?  I didn't

10    hear what you said.

11             BY MR. ANCHILL:

12        Q.   Harsher.  Harsher discipline.

13        A.   Harsher.

14        Q.   That's the reason why they didn't do the right thing

15    is because Potter did not get harsher discipline.

16             MR. ALTMAN:  Objection, argumentative.

17             THE WITNESS:  Do I have to answer that, Keith?

18             MR. ALTMAN:  You do.

19             THE WITNESS:  I don't want to say harsher.  I just

20    want to say the Army failed to follow their guidelines on the

21    table of penalties for what was done.

22             BY MR. ANCHILL:

23        Q.   Okay.

24        A.   I had a picture of it in the SHARP thing.

25        Q.   That's what I mean by not giving him a harsher
```

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 221

1    Q.   Okay.  After the investigation concluded, did the

2    work atmosphere change?

3    A.   Yes.  We -- we were all mandatoried to go to SHARP

4    again, the sexual harassment again, which for me was

5    devastating.  It was like -- it was a disgrace.  It was a

6    slap in my face, 'cause I've got to sit through this class

7    now, again, knowing that I've gone through this, and the

8    proper discipline wasn't even done.  So, every time I'm

9    sitting in that class, it hurts.  It hurt because she's like

10   oh, the Army has a zero tolerance.  We have this.  We have

11   that.  So, yeah, it changed.  You know, people weren't

12   allowed to watch TV, and they weren't allowed to talk about

13   politics.  I know I'm just throwing that in there because

14   that was part of it.  Yeah, it changed, definitely changed,

15   so.

16   Q.   Did -- after the conclusion of the sexual harassment

17   investigation, did the Army require everyone to take several

18   mandatory trainings?

19   A.   Yes, sir.

20        MR. ALTMAN:  Objection, form.

21        BY MR. ANCHILL:

22   Q.   Okay.

23   A.   Yes.  We were all mandatory to take SHARP complaint

24   sexual training, and all other training.

25   Q.   How many trainings were there that were mandatory?

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 222

1      A.   Other than the SHARP, I don't remember the other

2    ones.  Definitely the SHARP was back-to-back.  There was

3    something else.  I don't remember what it was exactly.

4      Q.   Do you fault the Army for offering the SHARP

5    training?

6      A.   No.

7      Q.   Okay.

8      A.   It's great.  It should be offered there.

9      Q.   Okay.  By the way, what -- what -- are you aware of

10   what discipline Potter did receive?

11     A.   I did find out in -- I am aware of it, that's why

12   it's so devastating to me.  I am aware of it because I want

13   to say what's her name, Ms. Cassandra Williams was the EEO

14   investigator that came from -- she was out of state.  She

15   came in, and she asked Chief Potter what he got, and then she

16   wrote and send -- she sent me the whole investigation, here

17   you go.  So, I actually read it in the investigation that --

18   what he got.

19     Q.   What did you read?  What's your understanding of

20   what he got?

21     A.   From what I remember reading, like I said, I read it

22   a long time ago, it was just a little counseling whatever,

23   write up that goes away in whatever, a year.  It doesn't stay

24   in your record.

25     Q.   How do you --

                    FREE STATE REPORTING, INC.
                   Court Reporting Transcription
                      D.C. Area 301-261-1902
                   Balt. & Annap. 410-974-0947


                    FREE STATE REPORTING, INC.
                   Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

1    the 'N' word?

2        A.    'N' word could be night, nothing.  No, I'm asking

3    clarification of what you are asking me.

4        Q.    Okay, spelled, N-I-G-G-E-R.

5        A.    Okay.  And what's your question?

6        Q.    Have you ever used that word at work?

7        A.    I don't think so.  I don't remember.

8        Q.    Okay.  Did you ever approach Lesley Tillman and say,

9    what's up, followed by the 'N' word?

10       A.    I don't remember, sir.

11       Q.    You don't know either way?

12       A.    I don't remember.

13       Q.    You might have, you might not have?

14       A.    Might have, might not have said it.

15       Q.    Okay.

16       A.    I don't remember, yes, so.

17       Q.    What is Mr. Tillman's race?

18       A.    Black.

19       Q.    If you did say that, do you believe that's

20   appropriate?

21       A.    If I did say it?  I don't know.

22       Q.    Okay.

23       A.    It depends on if he was offended or what the context

24   was that day.  I don't know if it was.

25       Q.    Do you think it's acceptable to refer to an African

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 249

1    American or anyone by the 'N' word?

2        A.    Say that again.

3        Q.    Do you think it's acceptable to refer to an African

4    American or anyone by the 'N' word?

5        A.    I don't know.   I don't make that decision I mean.

6        Q.    Have you ever watched pornography at work?

7        A.    Yes.

8        Q.    Did you view pornographic pictures, pornographic

9    videos, or both?

10       A.    In my personal bunk room, yes.

11       Q.    What do you mean your personal bunk room?

12       A.    My private bunk room that I have -- it's my room.   I

13   sleep there 24 hours.   It's my -- I'm the only one sleeping

14   there.   Yes, it's my bunk.   It was my downtime, my do -- my

15   downtime.   It's my private, it's like my bedroom.   It's my

16   bedroom, basically.

17       Q.    Your bunk in the Detroit Arsenal?

18       A.    Yeah, it's my personal bedroom.

19       Q.    That's where you viewed the porn?

20       A.    I didn't -- I've seen it, yes.   I've used it.   It

21   wasn't on the government internet.   It was internet that we

22   pay for, so.

23       Q.    To your knowledge, has anyone observed you viewing

24   pornography?

25       A.    Not to my knowledge.

Electronically signed by Jeremy Tieking (501-087-518-8444)                                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 252

```
 1        Q.   Okay.  Does watching pornography at work violate any

 2   work -- or workplace rules?

 3        A.   I think if you're on a government computer, yes.

 4        Q.   Okay.  What about on a personal computer the way

 5   that you were viewing it in your bunk room at the Detroit

 6   Arsenal?

 7        A.   I don't -- I don't think it violates anything that

 8   I'm aware of.

 9        Q.   Okay. I'm showing you what we'll mark as exhibit

10   eight.  This is Bates labelled DEF 881.

11             (At 4:19 p.m., deposition exhibit 8 marked.)

12             BY MR. ANCHILL:

13        Q.   Can you tell us what this document is?

14        A.   Yep, see it.

15        Q.   What is that?

16        A.   Basically what it says.

17        Q.   What is the document?

18        A.   What do you mean what is the document?

19        Q.   What is it?

20        A.   Memorandum for records it says.

21        Q.   Okay.  Is there anything in that memo that's

22   inaccurate?

23        A.   Nope.

24        Q.   Okay.  Did you leave a pornographic website up on

25   your computer screen in your bunkroom and then leave the
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 253

1    bunkroom?

2        A.   Yeah, because we responded to a call, yep.

3        Q.   Okay.  Why'd you do that?

4        A.   Didn't do it on purpose.

5        Q.   Okay.

6        A.   I had to respond to a call.

7        Q.   And to your knowledge, Potter saw it?

8        A.   Yep, obviously, yep.

9        Q.   This occurred in September 2017?

10       A.   I don't know if that -- where does it say that?  I

11   don't remember the date.  Yeah, that's what it says, yep.

12       Q.   Do you believe it's a serious matter to have

13   pornographic material on your computer screen at work?

14       A.   Do I believe it's -- if I was on a government

15   computer, I'd say yes.

16       Q.   Okay.  What about the way you were viewing it?

17       A.   It was my bedroom, my bunk --

18       Q.   So, not --

19       A.   -- my privacy, my bedroom, my -- you know.  So, it

20   was my privacy.  It was my bedroom.

21       Q.   So, not serious?

22       A.   It was my privacy in my bedroom, nobody has the

23   right to go in there.  Nobody has the right to do anything,

24   so.

25       Q.   So, not a serious matter, correct?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947
FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

```
                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MICHIGAN
                      SOUTHERN DIVISION


    JOE DASILVA, JR.,                )
                                     )  Civil No. 20-11358
         Plaintiff,                  )
                                     )
         vs.                         )
                                     )
    CHRISTINE WORMUTH,               )
    Secretary of the Army, and       )
    MARTIN POTTER, in his            )
    individual capacity,            )
                                     )
         Defendants.                 )


                DEPOSITION OF JOE DASILVA, JR.




    DATE:            Friday, November 18, 2022

    TIME:            9:04 a.m. to 1:50 p.m.

    FACILITATED BY:  Free State Reporting, Inc.


    PURSUANT TO:     Notice by counsel for the Defendant for
                     purposes of discovery, use at trial, or
                     such other purposes as permitted under
                     the Federal Rules of Civil Procedure and
                     Federal Rules of Evidence

    REPORTED BY:     AMY SHANKLETON-NOVESS

                     Pages 1 - 141
```

Page 263

```
 1                    P R O C E E D I N G S
 2    Whereupon,
 3                         JOE DASILVA, JR.
 4    was called as a witness and, having been first duly sworn
 5    by the Notary Reporter, was examined and testified as
 6    follows:
 7         COURT REPORTER:  Would you please state and spell
 8    your first and last names for the record?
 9         THE WITNESS:  Joe DaSilva, Jr.  J-o-e D-a-S-i-l-
10    v-a, Jr.
11         COURT REPORTER:  Thank you.
12                    CROSS-EXAMINATION
13         BY MR. ANCHILL:
14    Q.   Good morning, Mr. DaSilva.
15    A.   Morning, sir.
16    Q.   You testified in our last session a few months
17    ago that you asked Mr. Young for a reference letter for a
18    part-time position and Mr. Young retaliated against you
19    when he refused to provide it.  Do you recall that
20    testimony?
21    A.   Hold on.  I'm confused.  Did I say that in the
22    last one or did you ask me?  I'm confused.
23    Q.   Well, let me just ask you.  Do you believe that
24    Mr. Young refused -- retaliated against you when he refused
25    to write you a reference letter for a part-time position?
```

Page 264

1      A.   Yes, that did happen.  Correct.  I did ask him

2  for that.

3      Q.   What is the part-time position that you asked Mr.

4  Young to recommend you for?

5      A.   It was a reserve police officer at the time.

6      Q.   So it was a position for a reserve police

7  officer?

8      A.   Yes.

9      Q.   Was that with the Army or with some other

10  employer?

11      A.   No, no.  Just an outside agency from the Army.

12  It was just outside the Army outside the agencies.

13      Q.   What agency was the potential position for?

14      A.   I think it was the Washtenaw County Sheriff's

15  Department Reserve Program.  Because I live in Washtenaw

16  County.

17      Q.   So that's not a federal government position?

18      A.   No, no.  Nothing to do with federal government.

19  No, sir.

20      Q.   Did you ever apply for that position with the

21  Washtenaw County Sheriff's Department?

22      A.   I didn't finish the application.  No.  It was the

23  Marine Division and I wasn't able to accomplish -- finish

24  everything.  Just didn't happen.

25      Q.   Why were you not able to finish the application?

Page 265

1          A.   You have to swim a long way and I have a bad

2     rotator cuff and I wasn't able to swim that long.  I tried

3     going to YMCA to swim and I wasn't doing too good so I just

4     never even finished applying.  I got the application, got

5     everything, starting to filling it out.  And he's like, oh,

6     you know you got to learn -- you got to swim.  You got to

7     test.  Because in the Marine Division you have to be able

8     to swim.

9               So I went to the YMCA and I was swimming, I was

10    swimming.  I was like, oh, I can't do this.  My right --

11    because I have a rotator cuff tear so I was like -- and

12    then I just never did it.  And he never wrote me a letter

13    anyway so I just never finished it up anyway.

14         Q.   So a physical limitation that you had prevented

15    you from meeting one of the requirements of that position?

16         A.   Well, they didn't --

17              MR. ALTMAN:  Objection to form.  Go ahead.

18         A.   They didn't tell me it was -- I chose that to not

19    go any further because I was swimming but it was getting

20    hard to do what they required.  And I already knew the

21    requirements in advance because I signed the application.

22    And I'm like, well, before I go any further.  Because I

23    didn't like -- I didn't even submit my application at the

24    point -- I grabbed it, looked at everything.  I went and

25    asked Mr. Young for a reference letter and he said no and

Page 266

1   then I said, well, I'm going to keep trying.

2          And I went swimming and I went to the YMCA and I

3   was like, I'm not even going to go through with this.  It

4   hurts.  So that was it.  So they didn't tell me no.  I made

5   the decision to not even apply because when I read the

6   standards, I was like, oh, this swimming part is the only

7   part that's going to get me.  So I never continued.

8   Correct.

9      Q.   One of the claims you bring in this case is a

10  sexual harassment claim against Potter.  Correct?

11     A.   Yes.

12     Q.   How do you define the term sexual harassment?

13          MR. ALTMAN:  Objection.  Form.  But you can

14  answer.

15     A.   Been a while since I took the class but I think

16  it's like touching, inappropriate statements, sexual

17  statements that aren't wanted.  Touching that aren't wanted

18  or something like that.  I don't remember the whole thing.

19  But you know -- asking for favors or something about -- if

20  you do this or something or -- that's -- I think that's the

21  definition I remember.  I don't remember the whole thing.

22     Q.   Which part of that definition did Potter violate?

23          MR. ALTMAN:  Objection.  Form.

24     A.   About sexual statements he's made to me.  That's

25  the ones he violated that I believe.  Do I have to say it

Page 271

1    disparate treatment.  And I felt uncomfortable.  It's like,

2    this is all continuing.  So I didn't feel comfortable at

3    all going towards him.

4            Because at that point, I realized this guy

5    doesn't like me and I have it here in writing.  It proves

6    that he has some issues with me.  So I didn't feel

7    comfortable at all.  So when I filed that EEO complaint

8    with the disparate treatment, the EEO office -- our

9    actually -- our EEO office was actually, for some reason,

10   not working.

11           So I ended up going to TACOM's EEO because that

12   was the next office.  And the lady that took my complaint,

13   that's when she said, hey, is there anything else other

14   than the disparate treatment and evaluation that you want

15   to add to this.  And I'm like, yeah.  If this is the time

16   -- she goes, this is the time to add.  So that's when I

17   added, yes, can you tell him to make -- stop making the

18   statements if I wear a B-size bra.  So that's what I did.

19      Q.   Did Potter's comments that you take issue with,

20   the comments about wearing a bra, the comment about how

21   much breast implants cost, did those comments interfere

22   with your ability to do your job as a firefighter?

23      A.   I mean, I had a job to do.  I just had to deal

24   with it, with the comments.  And I had to deal with the

25   other reactions of people at the station knowing and

Page 272

1    laughing at me.  But I had a job to do.  I mean, it wasn't

2    easy.  But I don't think it interfered with my job.

3              But it bothered me.  It definitely didn't make me

4    feel good.  So when I was down, you know, down time at the

5    fire station, yeah, I thought about it.  I'm like -- you

6    know, it was horrible.  But I tried to do the best I can

7    with my job.  Try not to let that affect my job because I

8    have a family to support.

9        Q.   Again, I apologize if I asked you this last time.

10   But do you believe that Potter's comments about you wearing

11   a bra and about the cost of breast implants, do you believe

12   that he made those comments because he harbors a bias or

13   hostility toward the male gender.

14             MR. ALTMAN:  Objection.  Form.

15       A.   So you're asking -- rephrase that again.

16       Q.   Sure.  The comments that you take issue with that

17   Potter made, do you believe that he made those comments

18   because he harbors hostility or bias toward males in

19   general?

20       A.   I can't answer that --

21             MR. ALTMAN:  Objection.  Form.

22       A.   Oh, sorry.  I can't answer.  I don't know the

23   answer.  I can't tell you why he made those -- are you

24   asking me why he made them?  Is that what the question --

25       Q.   I'm asking your belief as to why he made them?

Page 274

1    like him.  I can't explain that -- why.  I picked -- did

2    not pick him because I didn't want to work with him.

3         Q.   And the firefighters who pick him because they

4    like him are male.  Correct?

5         A.   Well, yeah.  We don't have any females on our

6    station.  So yeah.

7         Q.   That was going to be my next question.

8         A.   Yeah.

9         Q.   All the firefighters are male.

10        A.   They're all males at our station.  So yeah,

11   there's no females.

12        Q.   When Potter made the comments to you that you

13   take issue with about wearing a bra and about the cost of

14   breast implants, do you believe that Potter was making fun

15   of you for not having a body like a man?

16             MR. ALTMAN:  Objection.  Form.

17        A.   I don't know why he did it.  To hold up a pencil

18   and say I could hold it under my breast, he made that

19   statement in the kitchen in front of another firefighter.

20   That was like -- it made me feel unmanly.  It made me feel

21   emasculated.  It's like, wow, this guy is making me feel

22   horrible.  So I don't know why he said it.  I can't answer

23   that question.  I don't -- I'm not in his brain.  I don't

24   know why people -- he did it.  So I know I didn't feel good

25   about it.

Page 276

1       Q.   Do you recall the incident discussed in Exhibit

2   9?

3       A.   Yes, I do.

4       Q.   Is there anything -- what is Exhibit 9?

5       A.   Well, Exhibit 9 -- it's not completely accurate.

6   And this was supposed to be removed from record in six

7   months.  So it shouldn't even be here.  Chief Ball said it

8   would be removed.  My supervisor at the time was Chief

9   Tillman.  And Chief Tillman spoke to me that day.  And he

10  told me that he went and saw Jill -- now that I'm reading

11  this.  I never did touch her.  And she told him that I

12  never touched her.

13           And then, when Tillman came back -- because I

14  refused to sign.  I go, I didn't touch her.  I never

15  touched her.  And he said, I understand that you didn't

16  touch her; she told me you didn't touch her either but we

17  just want to document it so she can feel comfortable in

18  whatever happened.

19           So I ended up signing it anyway because Chief

20  Ball said it was going to be removed from the record in six

21  months.  So I don't know why it's even here.  But no, I

22  never touched this woman.  And Chief Tillman will testify

23  to that, too.  Because he went specifically and talked to

24  her directly because he was my supervisor at the time.  So

25  I never did touch her.  So that's why I refused to sign.

Page 277

1  But like I said, I signed it and it doesn't mean -- just

2  because you sign a document, it doesn't mean you did it.

3  It just says you accept what they wrote.  But I never

4  touched her and Chief Tillman will testify to that.

5      Q.   How does Chief -- how would Chief Tillman know

6  whether or not you touched her?

7      A.   Because she told him.  And he told him when I was

8  doing this -- I go, Chief, I'm not going to sign this.  He

9  goes, I know you didn't touch her.  She told me you didn't

10  touch her.  But we're just doing this -- he said we're

11  doing this -- and Chief Ball said we're doing this to

12  protect the department.  I said, okay, I'll sign it.  And

13  he says, it goes away in six months.  So it's not even --

14      Q.   So your --

15      A.   -- supposed to be here.

16      Q.   So your testimony is that Ms. Bramer told Tillman

17  that you did not --

18      A.   I did not touch her.

19      Q.   -- touch her.  Is that correct?

20      A.   That's correct.  Because I talked to him

21  specifically about it.  Because he went over there and

22  talked to her.  So I never touched her.

23      Q.   Did you observe Ms. Bramer tell Tillman that you

24  did not touch her?

25      A.   No, I wasn't there.  He went and talked to her by

Page 279

1  know exactly what it said because I didn't get to read it.

2  But I know there's one there.  So I'd like to get a copy of

3  it.

4      Q.   Has Potter ever touched you in a way that you

5  found to be offensive?

6      A.   No.

7      Q.   I asked you during our last session a few months

8  ago if you've ever gone by any other names.  I want to

9  clarify what I mean by that.  Have you ever had another

10  name, either another first name or another last name?

11     A.   I did say that.  Jose.  My birth name is Jose.

12  J-o-s-e.  Jose Antonio Domiciano DaSilva.  That was my

13  birth name.

14          MR. ALTMAN:  Only two middle names?

15          THE WITNESS:  Yeah.  Tell me about it.  What

16  happens when you're born in another country.  You're born

17  in Brazil, they add like eight middle names.  It's

18  horrible.  It literally didn't fit on my driver's license

19  and that's why I legally changed it when I became a U.S.

20  citizen.  They're like, you can change your name.  I said I

21  just want to shorten it because this is ridiculous.

22          BY MR. ANCHILL:

23     Q.   In what year did you change your name if you

24  recall?

25     A.   I don't remember.  I don't remember.  90

Page 285

1   on driving.  So I don't know.

2       Q.   When you say that you might have, what might you

3   have said?

4       A.   I don't recall.  I don't have a clue what I said.

5       Q.   Have you ever made fun of anyone's weight at

6   work?

7       A.   I think when we were having a weight loss thing,

8   we all made fun of each other.  We all said ourselves we

9   were a little overweight but I don't think I made fun of

10  anybody.  I don't recall making fun of anybody.

11      Q.   Okay, so --

12      A.   When we had our weight loss thing, we all -- we

13  were like, oh, we're all overweight.  So I don't think I

14  remember or recall saying anything specifically about

15  somebody else.  I might have questioned somebody that said,

16  oh, you're not that heavy or you're not that light.  I

17  didn't make fun of anybody.  But I might have questioned

18  somebody.  Because I'd say they'd weighed so much.  They --

19  no, I actually weigh more.  I'm like, well, you don't look

20  it.  Or I've said the same thing.  But I've never recall

21  making fun of anybody.

22      Q.   Have you ever used the term fat fuck at work?

23      A.   Might have once or twice.  I don't recall when.

24  But I might have said it.  Yes.

25      Q.   To whom did you direct that term?

Page 286

1        A.   I have no idea if I've said that to anybody or

2    just said it out of anything.

3        Q.   Who is Brian Ferman?

4        A.   One of the firefighters.

5        Q.   Did you ever call him a fat fuck?

6        A.   I don't remember.

7        Q.   Is it possible that you did?

8        A.   I don't think so.  I don't -- I know Brian so

9    probably not.

10       Q.   Have you ever made fun of Mr. Ferman's weight?

11       A.   I don't recall if I did.

12       Q.   Who is Scott Magowan?

13       A.   One of the firefighters.

14       Q.   Have you ever made fun of his weight?

15       A.   No.  We've talked about our weights.  We never

16   made fun of it.  Him and I talked a lot.  He stood up in my

17   wedding.  So yeah, I've never -- don't think I made fun of

18   Scott.  We might have talked a lot about our weights.

19   But --

20       Q.   Tell us what you talked about with Mr. Magowan

21   with regard to weight.

22       A.   It was when we were doing a weight loss thing.

23   We were talking about how much we need to lose.  Like I

24   said I need to lose this.  And he's like -- I go, you don't

25   look like you need to lose that much.  And he's like, oh,

Page 290

1       A.   I mean, I don't think so.

2       Q.   Is it possible that you have?

3       A.   No.

4            MR. ALTMAN:  Objection.  Form.

5       Q.   So your testimony today is you have never talked

6  to your coworkers at work about your sexual relationship

7  with your wife.  Correct?

8       A.   I don't recall anything like that.  I don't

9  remember saying anything to anybody.

10      Q.   Did you ever brag to your coworkers or to one of

11 your coworkers that you bent your wife over a couch after

12 coming home from an event?

13      A.   No.

14      Q.   Did you ever say anything to a coworker about

15 bending your wife over a couch?

16      A.   No.

17      Q.   Have you ever exposed your penis to a coworker?

18      A.   No.

19      Q.   Have you ever told a coworker that you're well

20 endowed?

21      A.   No.

22      Q.   Have you ever told a coworker that you "have a

23 big dick"?

24      A.   No.

25      Q.   So your testimony today is that you never exposed

Page 291

1    your penis to Mr. Fern?

2           MR. ALTMAN:  Objection.  Asked and answered.

3       A.   Nope.

4       Q.   If Mr. Fern were to say -- well, first of all,

5    who is Mr. Fern?

6       A.   One of the firefighters.  Well, I think he's an

7    inspector now.  But one of the firefighters.

8       Q.   If he were to say that -- if he were to testify

9    in this case that you did expose your penis to him, do you

10   have any reason that you can think of why he would lie?

11          MR. ALTMAN:  Objection.  Form and foundation.

12      A.   Nope.

13      Q.   Have you ever compared your wife's looks to the

14   looks of other women such as women on TV or the wives of

15   other firefighters?

16      A.   Have I ever compared looks?  Like give me an

17   example of what you're asking.

18      Q.   Like suggesting that your wife is better looking

19   than another firefighter's wife, for example.

20      A.   No, I've never done that.  I've always said my

21   wife is beautiful.  That I have said.

22      Q.   Have you ever compared her looks to the looks of

23   any other women?

24      A.   Like --

25      Q.   While at work?

Page 294

1    specifically.

2        Q.    To your understanding, is she of an Asian

3    nationality?

4        A.    Something like that.  I don't know it completely.

5        Q.    What would Shane Beal say about his wife in the

6    kitchen?

7        A.    Bad things.  Just a lot of bad things.  He'd call

8    her stupid.  Didn't know what she was doing.  It was just

9    pretty horrifying.  We were all like, wow.  So we stay out

10   of that -- I stayed out of it.  And we were like, that's

11   his business.

12       Q.    Do you recall any other statements that Mr. Beal

13   made about his wife?

14       A.    There's a lot.  I just don't recall them all.

15   But they weren't good.  I know that.

16       Q.    Can you be more specific?

17       A.    I -- like I said, he'd call her dumb or stupid or

18   she didn't know what she was doing and -- like I say, I

19   don't recall the whole entire thing.

20       Q.    Did you ever ask Shane Beal if it's true that

21   Asians have a slanted vagina?

22       A.    I don't recall ever asking that.  I don't recall.

23       Q.    If he says you asked him that question, would you

24   have any reason to dispute that?

25             MR. ALTMAN:  Objection.  Form and foundation.

Page 298

1    Correct?

2              MR. ALTMAN:  Objection.  Form and foundation.

3         A.   I don't know why somebody would -- I don't

4    discuss that at work.

5         Q.   I asked you earlier if you've ever exposed your

6    penis at work.  And I just want to make sure your testimony

7    today is very clear.  It's your testimony that you have

8    never shown a coworker your penis.

9         A.   Nope.

10        Q.   Correct?

11        A.   Correct.

12        Q.   Including inside a bunk room?

13        A.   Yeah.

14        Q.   So you've never shown Mr. Fern your penis inside

15   his bunk room?

16        A.   Nope.

17             MR. ANCHILL:  I'm going to show you what we'll

18   mark as Exhibit 10.  This is your initial disclosures in

19   this case which is a document that you produced to the

20   government, to the Army in this case.

21                                 (Whereupon, the document

22                                 referred to as Exhibit

23                                 Number 10 was identified

24                                 for the record.)

25             MR. KONCIUS:  And while you're handing that out,

1          Number two is Potter.  We know what information

2   he has.  Number three, Christine Wormuth.  What information

3   does she have about your lawsuit?

4        A.   Well, it's the secretary of the Army.  Whatever

5   we forwarded her.  I don't -- that's beyond my level.  I

6   don't -- how do I answer that because I don't -- it says

7   chief secretary of the Army.  So whatever was submitted to

8   her.  I don't know, sir.  I can't answer that because

9   that's way above my head.

10       Q.   Do you know whether she has any personal

11  information about your case or your lawsuit?

12       A.   Oh, that's what your -- no, I don't know.

13            MR. ALTMAN:  Objection.  Form and foundation.

14  Somebody is beeping.

15       Q.   Shawn Edwards.  Who is he?

16       A.   Fire chief.  Well, at the time.

17       Q.   From what period of time roughly if you know?

18       A.   I don't know.

19       Q.   What information does he have that's --

20       A.   The time -- there.

21       Q.   I'm sorry?

22       A.   From the time this -- the incidents have -- for a

23  period of time that he was there.  I don't know exactly

24  what it was.

25       Q.   What information does he have that's relevant to

1  EEO complaint, and he's the deciding official on what

2  punishment is given.  So he has all the information

3  actually.

4      Q.    Number eight is Robert G. Porter.  Who is he?

5      A.    He's in charge of human resources.  He's the

6  gentleman that did -- Robert G. Porter is the gentleman

7  that did the 15-6 investigation of the allegations of

8  sexual harassment.  He did the investigation, the 15-6.

9  That's who was assigned to do the investigation so has

10  everything.  He -- supposedly he made all the decisions.

11  He did the recommendation for the -- penalties, for

12  punishment.  He did all that.  And then he submitted that

13  to Mr. Moscone.

14      Q.    Do you know what he recommended in the way of

15  punishment?

16      A.    I am not -- I'm not allowed to see that so I

17  would not know.

18      Q.    Let's get down to number 12.  Matt Hoiltyn.  Who

19  is he?

20      A.    One of the firefighters.

21      Q.    And what information does he have that's relevant

22  to the lawsuit?

23           MR. ALTMAN:  Objection.  Form and foundation.

24      A.    I mean, they were -- 12, 13 -- I'm looking at all

25  the names here.  These were all people that have witnesses

Page 306

1       A.   Yes.  Correct.

2       Q.   And the different options for the ratings are

3  excellence, success, needs improvement, and fails.

4  Correct?

5       A.   Yes, sir.

6       Q.   What is the highest of those rankings?

7       A.   In each category?

8       Q.   Just of those four rankings, the highest one that

9  you can get is excellence.  Right?

10      A.   Correct, yes.

11      Q.   That means that you're exceeding standards?

12      A.   Yes.

13      Q.   And success means that you are meeting standards?

14      A.   Yes.

15      Q.   Turning now to Exhibit 11, who completed this

16  particular evaluation of you?

17      A.   Exhibit 11.

18           MR. KONCIUS:  It's in your hand.  That's the one.

19      A.   Say that again.

20      Q.   Who completed this evaluation for you?

21      A.   Looks like it's Chief Potter.

22      Q.   And this evaluation is evaluating your

23  performance for the calendar year 2017?

24      A.   Yes.

25      Q.   Is this the evaluation that you alleged is

Page 307

1    discriminatory?

2         A.   I'm not 100 percent.  I think it is.  Because I

3    don't have everything in front of me.  And it's been so

4    long.  I think it is because -- yeah, I think this is the

5    one.  Because on the technical competence is where I was --

6    thought I should have got excellent instead of successful.

7         Q.   That was going to be my next question for you is

8    the aspect of this evaluation that you take issue with as

9    discriminatory is number one under responsibilities,

10   technical competence.

11        A.   Yep.  Technical knowledge, skills, abilities, do

12   work right, time and sound judgement.  Yep.

13        Q.   And you believe that this is discriminatory

14   because you should have received an excellence in that

15   category --

16        A.   Yes.

17        Q.   -- instead of a success?

18        A.   Yes.

19        Q.   In this evaluation, Potter gave you one success

20   rating and three excellence ratings.

21        A.   Yes.

22        Q.   And then, at the bottom of the second page,

23   there's a box that says overall performance.  And there is

24   a scale of one, two, three, four, five.

25        A.   Yes.

Page 360

1     Q.   Thank you.  And I believe that when we're looking

2  at Exhibit 11, that was a 2017 and the Exhibit 12 was 2016.

3  Correct?

4     A.   Yes.

5     Q.   Those were the -- those were from the time frame

6  -- was it Chief Potter at that time or Assistant Chief

7  Potter at that time?

8     A.   Assistant chief.

9     Q.   Assistant chief.  And that is when he was your

10  immediate supervisor.  Correct?

11     A.   Yes.

12     Q.   When did that change?  When did he no longer

13  immediately supervise you?

14     A.   I think it was the following -- I don't know when

15  it changed but I think it changed when they picked shifts.

16  And then, you know, I don't know how it changed.  I just

17  know it changed.  I don't know the specifics of it.  I just

18  know that one year, next thing you know, it was -- I think

19  it was Tillman and then it was -- or before that was Ball.

20  Yeah, it just changed.  The next one was just Chief

21  Tillman.  I don't know exactly.

22     Q.   And that -- I'm sorry.  Okay.

23     A.   Sorry.

24     Q.   No worries.  And that's -- that was who performed

25  your --

Page 390

1        Q.   You testified that in response to Mr. Koncius'

2   questions that some people participated in the weight loss

3   competitions and some people didn't.  Correct?

4        A.   Yes.

5        Q.   You and Potter both did.  Correct?

6        A.   I think so.  It's been so long.  I think we did.

7        Q.   You testified in response to Mr. Koncius'

8   questions that there may have been another captain position

9   that you did not receive because of discrimination or

10  retaliation?

11            MR. ALTMAN:  Objection.  Misstates his previous

12  testimony.

13       Q.   Well, let me ask you, do you remember during our

14  deposition a couple -- during the deposition a couple

15  months ago, we had talked about a captain's position that

16  you did not receive that you applied to in 2019, that you

17  allege that Mr. Potter interfered with?  Do you remember

18  that?

19       A.   Yes, he sat on that board.  That was a person to

20  person.  Right.  That I do remember.

21       Q.   And I had asked you, are there any other

22  transfers or promotions that you believe that you were

23  denied because of discrimination and you said no.

24       A.   Correct.

25       Q.   Is that testimony true?