# Transcript of the Testimony of

# Arthur Young, Jr.

**Date:** November 9, 2022

**Case:** Joe DaSilva, Jr. v. Christine Wormuth

American Reporting, Inc.
Phone: 248-559-6750
Fax: 248-559-9918
Email: scheduling@american-reporting.com
Internet: american-reporting.com

| | | |
|---|---|---|
| 1 | Q. | And this memorandum is dated after the investigative |
| 2 | | report, obviously, because it references the investigative |
| 3 | | report, right? |
| 4 | A. | Yes. |
| 5 | Q. | So the finding of the Garrison commander was that there |
| 6 | | was sexual harassment, correct? |
| 7 | | MR. ANCHILL: Objection, foundation. |
| 8 | | THE WITNESS: I cannot speak to the specific Garrison |
| 9 | | manager's -- what I have in front of me is his memorandum |
| 10 | | for me and telling me to consider action against |
| 11 | | Mr. Potter and to use the documents provided and to do |
| 12 | | that in coordination with the Law Department and the |
| 13 | | Management Employee Relations to determine -- |
| 14 | Q. | (By Mr. Altman) Mr. Young, that wasn't my question. I'm |
| 15 | | sorry. I didn't mean to cut you off, but sometimes |
| 16 | | it -- I asked you, clearly, the Garrison commander found |
| 17 | | that there was sexual harassment, right? |
| 18 | | MR. ANCHILL: Objection, foundation. |
| 19 | | THE WITNESS: I have the memorandum in front of me of |
| 20 | | what that states. |
| 21 | Q. | (By Mr. Altman) Okay. And it states that the allegations |
| 22 | | of sexual harassment were founded, correct? |
| 23 | A. | Specifically what he says, "I have determined that the |
| 24 | | allegation was founded." |
| 25 | Q. | Okay. So the Garrison commander concluded that there was |

```
 1   Q.   So it was pretty clear that Mr. Moscone stated -- since he
 2        states that the subject is about sexual harassment, he
 3        references the complaint was about sexual harassment, that
 4        he found that -- he determined that the allegations were
 5        founded, that he determined that the allegations of sexual
 6        harassment were founded, right?
 7             MR. ANCHILL:  Objection, asked and answered.
 8        Foundation.
 9   Q.   (By Mr. Altman)  You can answer.
10   A.   Please restate the question.
11   Q.   Never mind.  I think we got it.  He said, "Consider
12        disciplinary action against Mr. Martin Potter."  Did I
13        read that correct?
14   A.   Yes.
15   Q.   What were the possible options for disciplinary action
16        against Mr. Potter?
17   A.   That was for me to work with the MER, who was our advisor
18        on how to apply the entire disciplinary process.  There's
19        a rubric called progressive discipline.  So there's a
20        series of factors that are taken into account to determine
21        everything from informal verbal counseling all the way up
22        through separation.
23   Q.   Mr. Young, what was the question that I asked you?
24   A.   What was the disciplinary action possible against
25        Mr. Martin Potter.
```

1  Q.  Right. What were the options? I didn't ask -- I'm not
2      asking how do you come to them, I'm asking what were the
3      options. You said separation was one. I think you said
4      reprimand was another. What were the other options?
5  A.  What I stated was anything from informal verbal counseling
6      up through separation.
7  Q.  Okay. So what are the steps in between?
8  A.  You start with informal verbal. You can go to informal
9      written warning. You can go to a formal written warning.
10     You can go to reprimand. You can go to a suspension. You
11     can go to proposing a separation.
12  Q.  Now, this was not the first time that Mr. Potter had been
13     involved in a complaint of harassment by Mr. DaSilva, was
14     it?
15  A.  I don't remember.
16  Q.  That would have been an important factor, though, if it
17     had happened before, right?
18  A.  Yes.
19  Q.  And are you aware that there had been previous allegations
20     and that Mr. Potter and Mr. DaSilva engaged in a consent
21     agreement on that the harassment would cease? Were you
22     aware of that at this time?
23         MR. ANCHILL: Objection, form.
24         THE WITNESS: I worked with my Management Employee
25     Relations. We reviewed the entire record.

```
 1   Q.   (By Mr. Altman)  But did you see if there were any
 2        previous allegations or complaints by Mr. DaSilva against
 3        Chief Potter?
 4   A.   I don't remember.
 5   Q.   If there had been previous complaints which were -- there
 6        was a consent agreement that they would stop, that would
 7        be an important factor in deciding any disciplinary
 8        actions to take, correct?
 9   A.   Yes.
10   Q.   What was the disciplinary action that was taken against
11        Mr. Potter?  It was Mr. Potter at the time.  It's
12        Chief Potter now.  I didn't mean to be disrespectful.  He
13        earned the title.  He deserves it.
14   A.   Upon consultation with Management Employee Relations, I
15        issued him a written letter of counseling.
16   Q.   Now, if there had been previous incidents in which there
17        were allegations and which Mr. Potter, Chief Potter had
18        agreed to various conditions including the fact he would
19        not engage in such conduct, wouldn't it have been
20        appropriate to have a more severe sanction for the second
21        incident?
22             MR. ANCHILL:  Objection to form.
23             THE WITNESS:  Management Employee Relations provides
24        me advice and counsel on what is appropriate, what is
25        applicable and what factors to consider.
```

```
 1   Q.   (By Mr. Altman)  Well, was the fact that he agreed to not
 2        engage in such conduct considered when you were evaluating
 3        what to do with Chief Potter?
 4             MR. ANCHILL:  Objection, form.
 5             THE WITNESS:  I can't speak to everything that
 6        Mr. Hervey (ph), the Management Employee Relations
 7        specialist who reviewed the entire package and provided me
 8        advice on how to proceed.
 9   Q.   (By Mr. Altman)  Well, during the advice and discussions,
10        did you discuss the fact that this had happened before?
11   A.   I don't remember specific.
12   Q.   Do you think you would remember if you had had that
13        discussion?
14   A.   Not specifically, no.
15   Q.   The written warning is pretty much just about the lowest
16        level of the discipline that you could apply, correct?
17   A.   Yes.
18   Q.   And as you sit here now as the person who was ultimately
19        responsible, do you think it was appropriate to apply the
20        lowest level of discipline if you knew that it happened
21        before, Chief Potter had specifically agreed not to engage
22        in such conduct in the future?
23             MR. ANCHILL:  Objection to form.
24             THE WITNESS:  In discussion with Management Employee
25        Relations and my review, yes, I do feel it was appropriate
```

1        and it seemed to have been successful.
2  Q.  (By Mr. Altman)  So just to be clear, as you sit here
3        right now, you think the sanction was appropriate in light
4        of the fact that he had done it before and had agreed not
5        to do it in the future?
6            MR. ANCHILL:  Objection, form.
7            THE WITNESS:  I believe the action taken was
8        appropriate, specific to the situation, yes.
9  Q.  (By Mr. Altman)  Are you saying that if you would make
10       this decision again knowing that Chief Potter had engaged
11       in such conduct before this and had specifically agreed
12       not to engage in such conduct and had done it again
13       anyway, that a written warning letter was sufficient
14       discipline?
15           MR. KONCIUS:  Objection, foundation.
16           THE WITNESS:  I believe the action taken was
17       sufficient for this complaint, yes.
18  Q.  (By Mr. Altman)  I didn't ask you about what was done.
19       I'm asking you today if you were presented with the fact
20       that Chief Potter had done this before and as part of the
21       resolution had specifically agreed not to engage in
22       harassing conduct and then he went and did it again, if
23       you were asked to make that decision today, do you think
24       that just simply sending a warning letter was sufficient
25       disciplinary action against Chief Potter?

```
 1   Q.   So as you sit here right now, is it your opinion as the
 2        person who was asked to decide this that two incidents of
 3        harassment was not sufficient to equate to a letter of
 4        reprimand?
 5            MR. ANCHILL:  Objection, form.
 6            THE WITNESS:  I worked with my Management Employee
 7        Relations specialist to determine what was.  Part of my
 8        job was to work with that advisor and discuss what it is.
 9        There is on the record the fact that I had initial email
10        with Mr. Hervey saying -- basically proposing a letter of
11        reprimand.  That was prior to Mr. Hervey and the legal
12        department then considering all the other factors and
13        Mr. Hervey coming back and advising me that in this
14        instance with these facts that a written letter warning
15        was appropriate and sufficient.
16   Q.   (By Mr. Altman)  Before today, were you aware that
17        Chief Potter had engaged in such conduct in the past and
18        had agreed as part of a resolution to not engage in such
19        conduct in the future?  Were you aware of that?
20            MR. ANCHILL:  Objection, form.
21            MR. KONCIUS:  Foundation.
22            MR. ANCHILL:  Foundation.
23   Q.   (By Mr. Altman)  You can answer.
24   A.   I don't remember the specifics.
25   Q.   That is not what I asked you.  I asked you were you aware
```

```
 1            sitting on that panel and I had no personal reservations
 2            about that because of my feeling that Chief Potter would
 3            conduct himself professionally.
 4     Q.     Had any other firefighters brought sexual harassment
 5            complaints against Chief Potter that you are aware of?
 6                   MR. ANCHILL:  Objection --
 7                   THE WITNESS:  I am not aware of any.
 8     Q.     (By Mr. Altman)  So how did you determine that
 9            Chief Potter's performance on this particular board would
10            not be influenced by the fact that Mr. DaSilva had raised
11            sexual harassment complaints against him?
12     A.     Assistant Chief Potter had accepted responsibility for his
13            inappropriate comment.  Assistant Chief Potter had taken
14            along with the other chiefs additional training and
15            mentoring and counseling and a period of time had elapsed,
16            so upon review it was determined and I agreed that
17            Assistant Chief Potter would continue to sit on the panel.
18     Q.     I understand, but we are not talking about his general
19            appearance on the panel.  We are talking about his
20            appearance on a particular panel with the particular
21            person who filed complaints against him.  You didn't have
22            any concerns that Chief Potter's participation in that
23            particular panel for Mr. DaSilva could be influenced by
24            Mr. DaSilva's complaints?
25                   MR. ANCHILL:  Objection, asked and answered.
```

```
 1              THE WITNESS:  No, I did not have concerns about that
 2        because of my confidence in Assistant Chief Potter.
 3   Q.   (By Mr. Altman)  Well, you would've thought that when
 4        Assistant Chief Potter when a first complaint had been
 5        brought against him and he agreed not to engage in that
 6        conduct in the future and that he wouldn't have, yet he
 7        did, right?
 8              MR. KONCIUS:  Objection, foundation.
 9              Sorry, Ben.  Go ahead.
10              MR. ANCHILL:  Same objection.
11              THE WITNESS:  Assistant Chief Potter had accepted
12        responsibility.  We had done the appropriate actions to
13        correct his behavior and to ensure no future problems
14        would occur and I had confidence that that was sufficient.
15   Q.   (By Mr. Altman)  So you didn't think that maybe there
16        might be a conflict of interest between Chief Potter
17        serving on Mr. DaSilva's promotion board?
18   A.   No, I did not consider it a conflict of interest.
19   Q.   And you said you took actions to ensure that Chief Potter
20        wouldn't do it again?  What were those actions?
21   A.   And as part of the resolution of the inappropriate
22        comment, we conducted additional EEO training for all
23        members of the department.  We had specific sensitivity
24        training conducted.  So we had a series of trainings.
25              I also had counseling with the Fire Chief who was a
```

```
 1            direct report to me who was the supervisor of
 2            Assistant Chief Potter for him to mentor and counsel
 3            Assistant Chief Potter.  So I -- I also took -- I asked
 4            the chief what his assessment was because, of course, he
 5            is there much closer on a daily basis than I am.  So there
 6            were a series of things done that led to my conclusion
 7            that it was appropriate for Assistant Chief Potter to
 8            continue to sit on the promotion panel.
 9    Q.      You keep talking about sit on the promotion panel
10            generally and I am talking about a specific promotion
11            panel.  Let me ask it this way, has any member of the
12            promotion panel ever not participated in a particular
13            person's promotion review because of one reason or
14            another?
15                 MR. ANCHILL:  Objection, form, foundation.
16                 THE WITNESS:  I don't have that information.  The
17            Fire Chief puts the panel together.
18    Q.      (By Mr. Altman)  I understand.  So you're saying there was
19            a specific review with respect to Chief Potter serving on
20            Mr. DaSilva's promotion panel as to whether that was
21            appropriate?
22    A.      Yes.
23    Q.      And who was part of that review?
24    A.      Mr. Moscone basically charged me.  I discussed it with the
25            then chief of our EEO office, Ms. Kleehammer, and I
```

```
 1           Mr. DaSilva's supervisor.
 2    Q.     And with that assistant chief have been on the promotion
 3           panel?
 4    A.     Yes.
 5    Q.     And do you know who that assistant chief was at the time
 6           of the promotion panel?
 7    A.     No, I do not have that in front of me.
 8    Q.     And would it be routine to have multiple assistant chiefs
 9           on the promotion panel?
10    A.     Yes.
11    Q.     What made you decide that a letter of reprimand to
12           Chief Potter was sufficient for a sanction when you raised
13           that to the other people who you are consulting with?
14    A.     Upon my review of the investigative report, that is what
15           I -- in opening my discussion with Management Employee
16           Relations with Mr. Hervey, I basically proposed a letter
17           of reprimand as being an appropriate level of discipline
18           to consider.
19    Q.     And I'm asking how did you come to that?
20    A.     Based on the investigative report results.
21    Q.     And you don't know whether you considered the fact that it
22           had happened again when you made that recommendation,
23           right?
24              MR. ANCHILL:  Objection, asked and -- withdrawn.
25              Go ahead.
```

```
 1           filed an EEO complaint?
 2                   MR. ANCHILL:  Objection, form.
 3                   THE WITNESS:  I am a proponent of trying to resolve
 4           things at the lowest level possible because it never
 5           closes out the options to continue to progress through the
 6           system.  So I am a proponent of starting at the lowest
 7           level possible to see what resolution is possible and
 8           that's -- I would say that's always the recommended
 9           procedure.
10      Q.   (By Mr. Altman)  Now, your relationship with Mr. DaSilva
11           changed after he filed this complaint, didn't it?
12                   MR. ANCHILL:  Objection, form.
13                   THE WITNESS:  My relationship with Mr. DaSilva had
14           changed prior to this complaint.
15      Q.   (By Mr. Altman)  Do you know why it changed?
16      A.   Yes.  A few years ago it had come to me that Mr. DaSilva
17           although he was using the open-door sessions and
18           mentor-mentee, it was brought to my attention that he was
19           using my name and position in the fire station kind of as
20           an attempted shield for him with his peers, telling them
21           that he had a direct line with the director, which he, of
22           course, does have a direct line with me, but it was
23           inappropriate the way it came to me that he was portraying
24           our relationship.
25      Q.   Did you ever talk to Mr. DaSilva about that?
```

```
 1   A.   Yes.  I specifically told Mr. DaSilva that if that had
 2        occurred that it was an inappropriate characterization of
 3        the relationship.  I spoke about that open-door policy is
 4        for all employees and the fact that he was -- had asked me
 5        to be kind of a mentor to him did not establish any kind
 6        of protected relationship for him.
 7             We had had those conversations many times because
 8        Mr. DaSilva did have -- he liked to bring things to my
 9        attention that he thought I needed to know from his level
10        that he felt I might not hear from other levels and so we
11        had had discussions about the difference between
12        professional career mentorship and a subordinate bringing
13        complaints and the fact that I could not -- that there was
14        no confidential informant nature if he expected me to take
15        some action about something.  We've had that discussion on
16        more than one occasion.
17   Q.   So the change in your relation had nothing to do with his
18        complaints about Chief Potter?
19   A.   No.
20   Q.   Were you angry with Mr. DaSilva that he had filed a
21        specific EEO complaint about Chief Potter?
22   A.   No.
23   Q.   Going back to Exhibit 21, in point number two where it
24        said -- it was talking about the actions to be taken, do
25        you see that portion?
```

```
 1         and answered.
 2              THE WITNESS:  I used the resources available to me to
 3         determine what was the appropriate action to take.
 4    Q.   (By Mr. Altman)  That wasn't my question, Mr. Young.  You
 5         just testified that his sanction was not enhanced because
 6         of previous conduct and I'm asking you why it wasn't
 7         enhanced because of previous conduct.
 8              MR. ANCHILL:  Objection, form, asked and answered
 9         several times.
10              THE WITNESS:  Upon advice from the Management
11         Employee Relations, we determined what was the appropriate
12         action to take in this specific situation and Management
13         Employee Relations does have the complete record in front
14         of them when they are making the advice to the management
15         official.
16    Q.   (By Mr. Altman)  And you agree that his sanction could not
17         have been enhanced because of his previous conduct,
18         correct?
19              MR. KONCIUS:  Objection, foundation.
20              MR. ANCHILL:  Objection, form, asked and answered.
21              THE WITNESS:  I believe that the appropriate action
22         was taken.
23              MR. ALTMAN:  I have no other questions.  Thank you,
24         Mr. Young.
25              THE WITNESS:  Thank you.
```

```
 1              MR. ANCHILL:  Can we take a couple minutes, if we
 2         could.  I may have a question or two.
 3              MR. ALTMAN:  Absolutely.  Of course.
 4         (Brief recess.)
 5                         CROSS-EXAMINATION
 6    BY MR. ANCHILL:
 7    Q.   Did anything prevent Mr. DaSilva from working overtime
 8         while the sexual harassment complaint was pending?
 9    A.   No.
10    Q.   Why not?
11    A.   The interpretation of the no contact order, we
12         specifically asked the Garrison manager what his intent
13         was.  He provided a response.  The no contact order was
14         the intent to prevent other than business communication
15         that the understanding was that if they were working
16         together, if they were on the same shift, that
17         Assistant Chief Potter would not engage in any unnecessary
18         communication with Mr. DaSilva, nor would Mr. DaSilva
19         engage in any unnecessary communication with
20         Assistant Chief Potter, that it would be related to
21         business.
22    Q.   You testified earlier that the letter of counseling that
23         was given to Mr. Potter appeared to be successful.  Do you
24         remember that testimony?
25    A.   Yes.
```

```
 1   Q.   Can you tell us what you meant by that?
 2   A.   The intent of discipline is always to correct the behavior
 3        and deter that behavior from occurring again in the future
 4        and it's to -- one of the things we look at, does the
 5        person that is taking discipline or counseling, do they
 6        accept responsibility for what they did.  Do they
 7        understand why some action is being taken, why they are
 8        being counseled.  And the idea is that you then look at
 9        what happens as you move forward and is there any
10        indication that that was not successful.
11             So I truly felt that Assistant Chief Potter accepted
12        responsibility for the inappropriate comment and the fact
13        that he had basically -- that such inappropriate
14        communication would not occur in the future.
15             The letter of counseling was very specific in the
16        fact that if it was to occur, that more stringent
17        discipline measures could occur.  So I felt it was
18        successful and ultimately that I will say contributed to
19        my decision that Assistant Chief Potter was a viable and
20        qualified candidate to become chief because his
21        performance and his communication and everything was very
22        professional.  So I felt that we had closed that matter
23        with issuing this letter of warning, this letter of
24        counseling to him.
25             MR. ANCHILL:  Thank you.  I have no further
```

```
 1      questions.
 2           MR. KONCIUS:  I have no questions.  Thank you for
 3      your time.
 4           MR. ALTMAN:  I do have some questions.
 5                      REDIRECT EXAMINATION
 6  BY MR. ALTMAN:
 7  Q.  So you said nothing stopped Mr. DaSilva from working
 8      overtime because of the no contact order, right?  But
 9      Chief Potter had already demonstrated he wasn't going to
10      follow agreements because he had already agreed to not
11      engage in such conduct and he did it again anyway, right?
12           MR. KONCIUS:  Objection, foundation.
13           MR. ANCHILL:  Objection, assumes facts, form.
14  Q.  (By Mr. Altman)  You can answer.
15  A.  As I stated, I felt Mr. Potter had accepted responsibility
16      and he had indicated an understanding of his situation and
17      that he had agreed not to do such things in the future.
18  Q.  But he already -- I'm sorry.  I didn't mean to interrupt
19      you.
20  A.  I was just going to state I was confident that we had
21      reached resolution.
22  Q.  Why didn't it cause you any concern that Chief Potter had
23      agreed previously and to not engage in such conduct and he
24      went and he did it anyway?
25           MR. KONCIUS:  Objection, foundation.
```

CERTIFICATE OF NOTARY - COURT RECORDER

STATE OF MICHIGAN)
                  )
COUNTY OF OAKLAND)

                I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that witness ARTHUR J. YOUNG, JR. remotely appeared before me at the time hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.
                I further certify that I am neither of counsel to either party nor interested in the event of this case.

_____
James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires: 10-30-2028