# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

JOE DASILVA, JR.,              )   Civil No. 20-11358
                               )   Hon. Mark A. Goldsmith
         Plaintiff,            )
v.                             )
                               )
CHRISTINE WORMUTH,             )
Secretary of the Army, and     )
MARTIN POTTER, in his          )
individual capacity            )
                               )
         Defendant.            )
_____)


              DEPOSITION OF JOE DASILVA, JR.



DATE:            Wednesday, September 7, 2022


TIME:            10:00 a.m. to 4:27 p.m.


FACILITATED BY:  Free State Court Reporting


PURSUANT TO:     Notice by counsel for the Defendant for
                 purposes of discovery, use at trial, or
                 such other purposes as permitted under
                 the Federal Rules of Civil Procedure
                 and Federal Rules of Evidence


REPORTED BY:     JEREMY TIEKING
```

Page 2

A P P E A R A N C E S

On Behalf of the Plaintiff:
   Keith Altman (257309)
   Law Office of Keith Altman
   30474 Fox Club Drive
   Farmington Hills, Michigan 48331-1956
   (516)456-5885
   keithaltman@kaltmanlaw.com

On Behalf of the Defendants:

   Benjamin A. Anchill (P70968)
   Assistant United States Attorney
   211 West Fort Street, Suite 2001
   Detroit, Michigan 48226
   (313) 226-9566
   Benjamin.anchill@usdoj.gov
   Brian E. Koncius (P69278)
   BOGAS & KONCIUS PC
   31700 Telegraph Road
   Suite 160
   Bingham Farms, Michigan 48025-3404
   (248)592-5000
   bkoncius@kbogaslaw.com

Page 3

| | | |
|---|---|---|
| 1 | Lawsuit complaint | 11 |
| 2 | Photograph | 54 |
| 3 | 2017 EEO complaint | 181 |
| 4 | SHARP complaint | 202 |
| 5 | 2018 EEO complaint | 223 |
| 6 | 2018 EEO complaint | 237 |
| 7 | Memorandum 3/17 | 245 |
| 8 | Memorandum 9/17 | 252 |

Page 4

Page 4

```
 1                    P R O C E E D I N G S
 2         THE COURT REPORTER:  Raise your right hand, sir.
 3         Do you promise to tell the truth, the whole
 4  truth, and nothing but the truth, so help you God?
 5         MR. DASILVA:  Yes.
 6  (Whereupon,
 7                    JOE DASILVA, JR.
 8  was called as a witness and, after having been first duly
 9  sworn, was examined, and testified as follows:)
10         THE COURT REPORTER:  Could you please state and
11  spell your name for the record?
12         THE WITNESS:  Joe DaSilva, Jr., D-A-S-I-L-V-A.
13  D-A-S-I-L-V-A J-O-E, junior.
14         THE COURT REPORTER:  And could you, Counsel,
15  state your appearances?
16         MR. ANCHILL:  Yes.  Benjamin Anchill appearing on
17  behalf of the Army and also joining me telephonically
18  today is Patrick Gary, a litigation attorney with the
19  Army, and Steven Whittington, an attorney advisor with
20  the Army.
21         MR. ALTMAN:  Keith Altman on behalf of the
22  Plaintiff, Joe DaSilva.  Also with me is non-attorney
23  Eric Altman.
24         MR. KONCIUS:  Brian Koncius for Defendant Martin
25  Potter in his individual capacity, and also with me is
```

2 (Pages 2 to 4)

Page 137

1    Q. What else if anything?
2    A. From what I recall that he was not going to support
3 me in anything. He was no longer going to support me in
4 anything I wanted to do. He told me to my face.
5    Q. What did he not support you in?
6    A. He usually writes me a reference letter if I want to
7 look for something, do whatever, and he says he's going to
8 stop doing that be -- he told me I'm going to stop doing that
9 because you're not a team player. He says you had other
10 options. You should have went a different route. I'm like
11 wow, okay. So, that was it.
12   Q. Okay. Anything else Young did to retaliate against
13 you?
14   A. Nope.
15   Q. Okay. Did you ask him for a reference letter that
16 he denied giving you?
17   A. Yep.
18   Q. Okay. What was the reference letter for?
19   A. I was going to go apply for a part time position.
20 He said nope, we're done. I said okay, so.
21   Q. We discussed earlier a sex discrimination claim
22 against Potter. What did Potter do? Strike that. Let's get
23 into your hostile work environment claim.
24   A. My what?
25   Q. Your hostile work environment claim.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 138

1    A. Yes.
2    Q. Okay. And again, for this question I'm just looking
3 for a list of names. Who are all the people who you believe
4 made your work environment hostile as part of this law --
5 that you allege as part of this lawsuit?
6    A. Chief Edwards, Chief Potter.
7    Q. Anyone other than Edwards and Potter?
8    A. Some of the other captains that work under Potter,
9 DeArmon. Some of the other firefighters that, you know,
10 didn't -- they were -- they showed to me that they were mad
11 once I filed this, so, you know, they just quit talking,
12 saying good morning. They wouldn't even say anything to me,
13 so.
14   Q. Do you allege as part of this lawsuit that other
15 firefighters created a hostile work environment for you?
16   A. Yeah, on his shift, the guys that worked for Chief
17 Potter.
18   Q. Okay. Who are the firefighters that contributed to
19 the hostile work environment?
20   A. Beal, he was a firefighter at the time. I think
21 he's a captain now.
22   Q. Sean Beal?
23   A. Yep. So, Redwood, he didn't like the fact that I
24 did it. That's all I can remember right now.
25   Q. I thought you testified earlier that you had a good

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 139

1 relationship with Sean Beal?
2    A. Well, I -- it doesn't mean that it doesn't change.
3 I had a decent relationship, yeah, I thought I did too.
4 Obviously, I didn't.
5    Q. And now you're alleging that he's part -- he
6 contributes to the hostile work environment?
7    A. Yeah. He didn't like it either. I mean, things
8 change, you know what I mean. Just like in the beginning.
9    Q. Okay. I'd like to discuss each act that you believe
10 contributed to the hostile work environment that you allege
11 as part of this lawsuit, and I'd like to go in chronological
12 order from oldest to most recent, okay?
13   A. Okay.
14   Q. So, when -- what is the first act that you believe
15 contributes to the hostile work environment claim that you
16 allege in this lawsuit?
17   A. Is that in here? I don't remember, that's why I'm
18 asking. Can I look it up and see what was part of it? Is
19 there something that I can look because I don't remember
20 everything. It's been four years.
21   Q. Okay.
22   A. So, can you help my understand which one you're
23 talking about if you want specifics?
24   Q. Let me ask you this, when -- when did the hostile
25 work environment start?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 140

1    A. It started 2008. We've always had a hostile work
2 environment. Now, it's because I filed my complaint.
3    Q. Let me rephrase that question.
4    A. You're asking me when it started, it started in 2008
5 to be honest with you.
6    Q. When is the hostile work environment that you allege
7 as part of this lawsuit, when did that start?
8         MR. ALTMAN: Objection, form.
9         THE WITNESS: Well, it started when I filed my first
10 EEO complaint, if you're asking, I mean, the original one.
11        BY MR. ANCHILL:
12   Q. Which -- which one?
13   A. The one about my evaluation.
14   Q. Okay, so, that's the 2016?
15   A. Yes.
16   Q. Okay. Okay. Now, what -- what is the first act
17 that -- that you allege contributes to your hostile work
18 environment?
19   A. From --
20   Q. Because I'd like to discuss each act.
21   A. From that day, from 2016?
22   Q. Okay, yeah.
23   A. Well, my evaluation, how I was evaluated.
24   Q. Okay.
25   A. How --

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

36 (Pages 137 to 140)

Electronically signed by Jeremy Tieking (501-087-518-8444)    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 141

```
 1       Q.  What's -- now, okay, so, we have your evaluation.
 2       A.  Yeah.
 3       Q.  What's the next act --
 4       A.  The email.
 5       Q.  -- that contributes to the hostile work environment?
 6       A.  Well, the -- the -- can you wear a B-size bra,
 7   'cause that's why I filed my EEO, you know.  And then my
 8   evaluation.
 9       Q.  Okay.  Let's talk about that one for a second.  Who
10   -- who mentioned a B-sized bra?
11       A.  Chief Potter.
12       Q.  Okay.  What did he say?
13       A.  "DaSilva, I bet you can wear a B-sized bra."
14       Q.  When did that occur?
15       A.  Don't remember exact date, but it occurred.
16       Q.  Do you remember the year?
17       A.  It happened -- it started in 2008.  I don't remember
18   exactly when.  I mean, I just know it -- that started in
19   2008, that statement.  I don't remember -- you know.
20       Q.  So, he -- he told you that you should wear a B-sized
21   bra in 2008?
22       A.  Yeah, that's when it all started.  Yes, sir.
23       Q.  Okay.  So, who observed when it -- in 2008, because
24   again, I want to go through every single act that you allege
25   contributes to the hostile work environment.
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 142

```
 1       A.  Okay.
 2       Q.  So, when is the first time he said -- he said that
 3   you should wear a B-sized bra?
 4       A.  That was in 2008.
 5       Q.  Okay.  What did he say?
 6       A.  He just said it.  So, I bet you can wear a B-sized
 7   bra.
 8       Q.  Okay.  Who observed that?
 9       A.  Back then, I don't have a clue.  I don't remember.
10       Q.  What was the context of the conversation?
11       A.  I don't remember.
12       Q.  What did you say after he said that?
13       A.  I have no idea.  I don't remember, sir.  It's been
14   so long.
15       Q.  Okay.  What is the next hostile act that contributes
16   to your hostile work environment claim?
17       A.  When I requested training from 2008, the next one, I
18   used to request training.  Like I said, they'd send -- I
19   remember they sent Fern and Beal to -- we were all
20   firefighters at the time, they got to go to driver operator
21   school.  I didn't get to go, and I requested, oh, we have no
22   money for you.  And then when those guys got their
23   certifications, they got promoted, and they got a step
24   increase grade before me.  I was like wait a minute, why
25   wasn't I offered this?  So, that's something that started it
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 143

```
 1   too.
 2       Q.  Okay.  When -- when were you denied the driver
 3   operator training?  What year?
 4       A.  I don't remember what year.  That was probably 2009
 5   or '10.  I don't remember when it was.  It was right after
 6   that.  I mean, it was whenever we were all trying to get our
 7   cert -- certifications, so.
 8       Q.  Okay.  What is the next act that you contribute --
 9   that you believe contributes to the hostile work environment?
10       A.  My evaluation.  The statements again, hey, I bet you
11   could wear a B-sized bra.
12       Q.  Hang on.  We're going one by one.
13       A.  Oh, okay.  The again, the statement was can you wear
14   a B-sized bra, and that was -- I don't remember when that
15   was, but it was done.  I remember when we were rolling hose
16   'cause we all do our own hose testing, and it was hot
17   outside.
18       Q.  Okay.  So, there was a second statement by Potter
19   that you should wear a B-sized bra?
20       A.  Oh, yeah.
21       Q.  Okay.
22       A.  This was -- this was continuous, I mean.
23       Q.  Okay, now I want to go though each one.  So, you
24   mentioned that there was a second statement that Potter said
25   to you you should wear a B-sized bra.  When did that second
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 144

```
 1   statement occur?
 2           MR. ALTMAN:  Objection, form, and misstates his
 3   testimony.
 4           THE WITNESS:  I don't remember exactly when.  It was
 5   -- it was on and off, because like I said, I worked two, off
 6   two, and then I'm on vacation for a while, then he's on
 7   vacation for a while.  I mean, it continuously happened in my
 8   career there, you know.  And like I said, because of our off
 9   time, and vacation time, you know, I only worked 15 days a
10   month technically, so, it's not like it happened every day,
11   so, but that was part and then we were rolling hose and doing
12   hose testing, and I remember coming in, who was with my
13   Kumlin, firefighter Kumlin was with me, and we come in, and
14   then Chief Potter had a pencil in his hand and he goes, hey
15   DaSilva, but you can put this pencil -- you know, you can
16   hold it with your -- with your breasts, hold this pencil
17   under with your breasts.  I'm like whoa.  So, that was one,
18   and then --
19           BY MR. ANCHILL:
20       Q.  Did that occur in the same conversation as the B-
21   size -- the second B-sized bra --
22       A.  No, that was a different one.
23       Q.  Okay.
24       A.  Sorry.
25       Q.  We're only discussing the B-sized -- the second B-
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

37 (Pages 141 to 144)

FREE STATE REPORTING, INC.
Court Reporting Transcription

Page 145

```
 1    sized bra comment.
 2         A.  Okay.  The second B-sized bra comment was just I
 3    don't know when, but it was said.
 4         Q.  Okay.  Do you remember who witnessed that?
 5         A.  No.
 6         Q.  Okay.  What did Potter say the second time?
 7         A.  The same thing, "bet you can wear a B-sized bra".
 8         Q.  Okay, okay.  What is the next instance that you
 9    believe contributes to the hostile work environment?
10         A.  The pencil.  I can hold the pencil under my breast.
11         Q.  Okay.  You mentioned that Kumlin --
12         A.  That was is the summer.  Me and Kumlin was there,
13    firefighter Kumlin.
14         Q.  Okay.  And summer of what year?
15         A.  I don't remember what year it was.  I don't remember
16    what year.
17         Q.  Can you ballpark it?
18         A.  It was before my 2016 EEO, that I know.
19         Q.  Okay.
20         A.  That's what made me file and say stuff.  So, it
21    could have been after.  I don't remember to just to be honest
22    with you.  It's already been so long, but --
23         Q.  Do you remember roughly how long before the 2000 --
24         A.  I know it was in the summer because we were rolling
25    hose and we were all sweaty.  That I remember.  It was in the
```

            FREE STATE REPORTING, INC.
             Court Reporting Transcription
              D.C. Area 301-261-1902
              Balt. & Annap. 410-974-0947

Page 146

```
 1    kitchen too, so, I don't remember the year, sir.  Sorry.
 2         Q.  And that -- but that comment was before the 2016 EEO
 3    about the pencil test?  The pencil test comment was before --
 4         A.  It might have been after.  I think that might have
 5    been the summer of 2017.  I don't remember exactly the date.
 6    Do you have what I've filed?  I mean, if I could look at what
 7    I filed and when I filed, I could answer the questions a
 8    little bit better.
 9         Q.  Okay.  What is the next --
10         A.  Is that something you guys have you can give me, or
11    no?  My original EEO complaints, so, I can --
12         Q.  We'll -- we'll go over that, yep.
13         A.  Because I can look at it and get a better idea, you
14    know what I mean.
15         Q.  What was the next instance that you believe
16    contributed to the hostile work environment?
17         A.  The -- my evaluation.
18         Q.  Wasn't that the first one that you mentioned?
19         A.  Oh, it's going to be -- I'm not trying to get to it,
20    so, now it's probably my evaluation, because the B-sized bra
21    thing was just continuous.  It was just said it when he said
22    it.  You know what I mean, like I said, when I worked, or
23    didn't work, like tried to pick a different shift, so, it was
24    just said sporadically, I guess.
25         Q.  How many times roughly did Potter make a comment
```

            FREE STATE REPORTING, INC.
             Court Reporting Transcription
              D.C. Area 301-261-1902
              Balt. & Annap. 410-974-0947

Page 147

```
 1    about a bra, you wearing a bra?
 2         A.  Many times.  I can't give you a number.
 3         Q.  Ballpark it.
 4         A.  It was just -- I don't have a ballpark.  It was just
 5    -- it was done continuously until the 2018 that it stopped
 6    because that's when I filed the SHARP complaint.  So, it was
 7    a lot of times.  I don't have a number, but it was definitely
 8    a lot of times.
 9         Q.  Did you ever tell him to stop saying it?
10         A.  I said it in my EEO complaint.
11         Q.  Before that, did you ever tell him to stop saying
12    it?
13         A.  No.
14         Q.  Okay.  Did you ever tell him it was unwelcome?
15         A.  In my EEO complaint.
16         Q.  Before that?
17         A.  No.
18         Q.  Okay.  So, after the pencil test comment, what was
19    the next act that you believe contributes to the hostile work
20    environment?
21         A.  Trying to think, it's been so long and so many
22    things have happened.  I don't -- I don't remember anymore
23    other than the -- the next one would be my EEO for my
24    evaluation.  That truly gave me a hostile work environment
25    because I'm already being treated differently, so.
```

            FREE STATE REPORTING, INC.
             Court Reporting Transcription
              D.C. Area 301-261-1902
              Balt. & Annap. 410-974-0947

Page 148

```
 1         Q.  And just to clarify, there was only one evaluation
 2    that you believe contributes to the hostile work environment?
 3         A.  Yes.
 4         Q.  Okay.  Okay, so, the acts that I have as
 5    contributing to the hostile work environment are as follows:
 6    Number one, the evaluation.  Number two, the comment about
 7    the B-sized bra in 2000 -- in approximately 2008.  Number
 8    three, the denial of the training.  Number four, a second
 9    comment about a B-sized bra in a year that you're not -- that
10    you don't know.  And number five, the comment about the
11    pencil test, possibly in the summer of 2017.
12         A.  Well, the statement of wearing the B-sized bra was
13    more than that.
14         Q.  Okay.
15         A.  I just don't have the -- I mean, like I said, it
16    happened -- it happened so many times it was ridiculous.
17    That's why it's like, you know, I mean, the other what
18    contributed to this is reprisal and whatchamacallit from the
19    first EEO.  This -- that's part of this.  You're asking what
20    has contributed to this is that too.  I mean, I had an
21    agreement with the EEO with a mediator that all these
22    statements and stuff would stop, and it didn't.  So, that's
23    another contributing factor to this.
24         Q.  Okay.
25         A.  Sorry, did I say something?
```

            FREE STATE REPORTING, INC.
             Court Reporting Transcription
              D.C. Area 301-261-1902
              Balt. & Annap. 410-974-0947

38 (Pages 145 to 148)

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)                    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 149

1   Q. Any other acts other than what you just testified to
2   that you allege contributes to the hostile work environment?
3   A. Not that I can recall.
4   Q. Has anyone ever harassed -- done anything that you
5   consider harassing in writing, or was it all verbal?
6   A. Say that again.
7   Q. Well, let me strike that question. Other than the
8   evaluation, did anyone harass you in writing?
9   A. Like you said, other then the evaluation, I'm going
10  to say no, that I can recall.
11  Q. Okay. Has anyone ever made any gestures towards you
12  that you consider to be harassing as part of your hostile
13  work environment claim?
14  A. Say that again.
15  Q. Sure. Has anyone made any gestures towards you that
16  you consider to be harassing?
17  A. Yeah, well, the director.
18  Q. Okay.
19  A. That was kind of crazy, you know. You had a
20  different route, you should have took a different route. You
21  had options. Why'd you do this? You know.
22  Q. I don't mean things that were said. I understand
23  the harassment that was verbal.
24  A. You're asking me -- that was verbal. He said it
25  verbally to me.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 150

1   Q. Right. But I mean --
2   A. Some of the firefighters treated me differently once
3   I filed this. You know, they wouldn't sit in the same
4   kitchen, they wouldn't eat. They'd be like walk -- I could
5   tell the difference. You could see the vibe. They wouldn't
6   say good morning to me. They wouldn't say hi. You know,
7   when we were doing training and I had a question on something
8   even, they would be like oh, they didn't even want to give
9   you the full attention that you deserved because of this.
10  So, yes, some of the -- yeah. It has happened.
11  Q. Has any -- has anyone ever did something to you that
12  you consider threatening as part of your hostile work
13  environment claim?
14  A. Not that I can recall.
15  Q. Do you allege that anyone has ever -- you allege as
16  part of your hostile work environment claim that anyone ever
17  made you feel unsafe?
18      MR. ALTMAN: Sorry, could you repeat that, please?
19      MR. ANCHILL: Sure.
20      BY MR. ANCHILL:
21  Q. As part of -- as part of your claims in this case, do
22  you -- do you allege that anyone ever did anything to make
23  you feel unsafe?
24  A. Yes.
25  Q. Okay, what?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 151

1   A. Why? I don't know why they said it.
2   Q. What -- what was said --
3   A. Oh, what was said.
4   Q. -- to make you feel unsafe?
5   A. Something about can we trust you in a fire, are you
6   going to save our lives, you know, because you're upset with
7   management. Even one of the captains were like you ain't
8   driving for me ever, you know. So, it's just been -- I felt
9   like am I even safe here?
10  Am I even -- you know, matter of fact, you know, I was in
11  a house fire where I got completely knocked out, and nobody
12  picked me up. The guys continued. The other department from
13  another city picked me up and I questioned that. I was like
14  wow, those guys didn't even stop and try to see if I was
15  okay. Ceiling came down and knocked me out cold, and the
16  other department that was there, they were the ones that came
17  up and dragged me. I'm like, talked to my and yeah, like,
18  why didn't you grab -- oh, we were fighting the fire.
19  So, that made me feel uncomfortable like if I get hurt,
20  these guys are just going to hope somebody else will come and
21  get me. So, that has happened, and that's pretty --
22  Q. What year did that happen?
23  A. 2019, I think December. So, and some of the
24  captains I've got -- like Beal promoted to captain and he's
25  changed. Once they get promoted, they just have this

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 152

1   attitude like they change. They're like you better know your
2   job, and you know, it's not my job to save you, and you know
3   all these things. So, but that did happen, the accident.
4   Q. Do you -- do you believe that any -- the firefighter
5   -- well, who reacted like -- who failed to help you?
6   A. Captain Skabilia was the captain on that day. He
7   said he even moved, and he knew it was going to hit me.
8   Q. But he's not one of the people that you listed as
9   being someone who discriminated or retaliated against you or
10  created a hostile work environment for you.
11  A. You're asking me what possibly changed, and I'm
12  telling you what could have changed. I don't know, but
13  people change as they move up in rank and do things.
14  Q. Do you allege that Skabilia discriminated against
15  you?
16  A. I'm not saying that. I feel uncomfortable that he
17  didn't stop what he was doing to make sure I was okay, so
18  that was a little, you know. The guy -- some of the guys
19  said we don't trust you because you went against management,
20  or you know, you filed this against Potter and he's a good
21  chief, and he's -- I'm like well, I'm sorry. He's a good
22  chief to you, but he's not a good chief to me, what he did to
23  me.
24  Q. Are you naming Skabilia as someone who discriminated
25  against you, retaliated against you, or created a hostile

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

39 (Pages 149 to 152)

Page 153

1  work environment toward you?
2      A.  No.
3      Q.  Okay.
4      A.  I'll say no.
5      Q.  Who else failed to come to your rescue during the
6  fire that you mentioned a minute ago other than Skabilia?
7      A.  Well, the driver couldn't do anything, so, I don't
8  know.  It's just they probably had -- they were busy, and
9  they probably had something to do, so.  So, I don't know
10 anybody.  There was only three or four of us there, so.
11     You just asked me what I thought.  I thought the guys
12 would stop, and maybe now that I'm thinking about it, they
13 might have -- couldn't stop what's going on, so, to probably
14 save me, so, I don't know.  So, just being honest with you of
15 what I thought, you know.
16     jQ.  Did you report that incident to your -- to anyone?
17 The fire in which you got knocked out?
18     A.  That was -- there was an incident done because I had
19 to go to the hospital.
20     Q.  Okay.
21     A.  Yeah, so.
22     Q.  There was an incident report done?
23     A.  I believe so.  I mean, I went to the hospital.  We
24 were helping another city, so.
25     Q.  Do you allege as part of this lawsuit that anyone

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 154

1  reacted in a way that was discriminatory or retaliatory with
2  regard to the fire that you just mentioned?
3      A.  Not in the fire that I mentioned, probably not, but
4  the way they treat me at the station and stuff, you know.
5      Q.  So, let me ask you that question again then.  Has
6  anyone said or done anything to you that you consider to be
7  threatening as part of your claim -- as part of the claims
8  that you make in this case?
9          MR. ALTMAN:  Objection, form, asked and answered.
10         THE WITNESS:  Did I answer it?
11         MR. ALTMAN:  Go ahead and answer.
12         THE WITNESS:  I think that I feel the threat of them
13 not taking my complaint serious.  I felt threatened after.  I
14 felt unsafe.  I felt scared.  I felt every time I went to
15 work great, I got the EEO, I've got the SHARP, I think I got
16 the director now pissed off at me, and you know, am I really
17 going to be safe if a fire happens or something's going on or
18 what's happening, you know.  I felt that way.  It's like a
19 natural instinct, like great because I know everybody's
20 pissed that I did this, so, I feel unsafe because basically
21 they did not take this seriously.  They didn't do what they
22 were supposed to.  So, yeah, I do feel unsafe and -- and
23 scared at work.
24         BY MR. ANCHILL:
25     Q.  And when you say they didn't take this seriously,

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 155

1  and didn't do what they -- they were supposed to, you're
2  referring to the punishment that Potter got?
3      A.  Not just the punishment.  How about not lying to me
4  about what they did, 'cause they lied to me.
5      Q.  Who lied to you?
6      A.  The Director and whoever made the final decision on
7  the punishment.
8      Q.  Who -- who -- what's the name of the person who lied
9  to you?
10     A.  Well, Mr. Young, Arthur J. Young, and whoever, I
11 guess Carrie Mead or Joe Moscone at the time was the garrison
12 manager.  So, if -- if --
13     Q.  How did they lie to you?
14     A.  Because they --
15     Q.  What was the lie?
16     A.  They told me they took care of the issue, and they
17 told me that proper punishment was given, and it wasn't.
18     Q.  That's your opinion.
19     A.  Your opinion, it's in writing.  How's it my opinion?
20 Its in black and white.  It's right there.  The Army Table of
21 Penalties it says right there and guess what?  He didn't get
22 that, and I still have to work and now you allow this guy to
23 interview me, and you promoted him, so, how does that make me
24 feel?  I feel scared coming into work.  I feel like oh my
25 God, this is horrible, I got to live with this every day.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 156

1  I've got to come to work every day knowing that because I did
2  this and this, they can't even do the right thing to make
3  this even legit.
4      Q.  But you testified earlier that you don't know who
5  made the decision as to what punishment to give Potter.
6      A.  It doesn't matter who made the decision.  I already
7  know the decision was not the proper -- the guidance that the
8  Army requires.  Because if it was me, I'd be out of a job
9  today.  We wouldn't -- I wouldn't be here.  My job -- I would
10 have been fired if this was me.
11     Q.  Okay.  Was all of the harassment that makes up your
12 hostile work environment claim verbal?  Other than the
13 evaluation because that was in writing.
14     A.  Yeah, that was in writing, that was --.  Well, the
15 email I got too.  Are you counting that?
16     Q.  Which email?
17     A.  The email that Chief Potter sent when I sent my --
18     Q.  With regard to the evaluation?
19     A.  With regards to the evaluation.
20     Q.  Yes.
21     A.  Okay, so, you're counting that.
22     Q.  It was all verbal --
23     A.  All verbal.
24     Q.  -- all verbal harassment?
25     A.  Yes.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

40 (Pages 153 to 156)

Electronically signed by Jeremy Tieking (501-087-518-8444)    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 161

1 Q. Okay, what -- what years did he serve as your
2 supervisor?
3 A. That I don't remember.
4 Q. Approximate is okay.
5 A. A couple years for sure. I don't remember exactly.
6 I know I got there -- I think I came back from police in
7 2007, so, definitely, you know, but when he became an AC, we
8 were going through stuff. I was like why can't I go to
9 class, why can't I do this, you know, and all the other guys
10 went, so, that's how it always ended up being.
11 Q. And is there anyone else who tried -- who Potter
12 treated similarly -- who he treated similarly as he treated
13 you?
14     MR. ALTMAN: Objection form and foundation.
15     THE WITNESS: I mean, I was the only one who was
16 sexually harassed. I don't know about everybody else -- I
17 don't know what he did to somebody else. I couldn't tell
18 you, but with me, that was where it was, you know. I can't
19 tell you how everybody else was completely treated, but you
20 know, I didn't see everything 24/7.
21     BY MR. ANCHILL:
22 Q. And when you say sexually harassed, you're referring
23 to the statement about -- the statements about the bra?
24 A. Yes.
25 Q. And the statement about the pencil test?

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 162

1 A. Oh, there was more than that. Did you want those?
2 There was other statements too.
3 Q. Is there anything we haven't already talked about?
4 A. Yes. When I -- he made a statement in the kitchen
5 in front of basically everybody, and I was walking into the
6 kitchen to put a cup into the dishwasher, and when I walked
7 in, the TV was on, he was standing next to the TV. Chief
8 Tillman was in the -- the little utility closet because a
9 couple of the other guys were just in the kitchen, and they
10 were all laughing, and I came in to put the dishes in. When
11 I came out, when I turned around to walk out, he's like, hey
12 DaSilva, tell us what it's like to get a breast implant. You
13 had it, how much does it cost? I was just like wow. And I
14 looked at Chief Tillman in the eyes because I was like --
15 'cause that was just the -- it was right there, and I walked
16 completely out. And that was -- that was the end of
17 everything. And he said that in front of everybody and the
18 guys were laughing, guys were just -- you know, the other
19 guys were laughing, and I felt like emasculated. I felt
20 embarrassed. I felt -- it was horrible, and that's when I
21 went -- I left the station, and I said -- I went right to
22 SHARP. I went -- I just immediately went to SHARP and I'm
23 like this is it. I just can't do this anymore and I went to
24 SHARP, and I left. I couldn't go to the fire chief because
25 he made the statement about my wife in the kitchen before.

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 163

1 So, I can't go to that chief because he did the same thing.
2 So, then I didn't -- you know, the director didn't do
3 anything to him, so I went ahead and went right to SHARP,
4 right down to another building, filed my SHARP complaint, and
5 then went to EEO and filed it, and that's where we're at
6 here. So, that's what was said in the kitchen.
7 Q. Okay. Tell us all the comments that were made that
8 you consider to be sexual harassment. So we have the
9 comments about wearing a bra, correct?
10 A. The B-sized bra, yep.
11 Q. Okay. And you don't know how many times that
12 comment was said?
13 A. A lot of times. In many years it was a lot -- it
14 was said a lot.
15 Q. But you can't give any kind of --
16 A. I can't but it was just -- it was -- it was -- it
17 was, you know, it wasn't -- it wasn't done every day because
18 I didn't work every day. So, I'm telling you that, it was
19 done -- it was said more than it should have said. It was
20 said a lot. And then --
21 Q. But you have no idea how many times.
22 A. Like I said, I worked 15 days a month, you know, I
23 don't see him as much. I try not to work with him. I used
24 all my sick leave to stay away from him. It was said a lot.
25 That's all I know. The one in the kitchen, that was only one

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 164

1 time because after that they said he had to stay away from me
2 because the investigation was going on. So, that was only
3 said once. The wearing a B-sized bra, that was said numerous
4 times, many, many time. And then to hold a pencil under my
5 breast, that was -- that was only one time. So.
6 Q. Okay. Other than the statements about the bra, the
7 one statement about breast implants, and the one statement
8 about the pencil test, are there -- is there anything else
9 that you believe constitutes sexual harassment?
10 A. No.
11 Q. Okay. Do you believe that Potter is motivated by
12 hostility toward the male gender when he makes these
13 statements to you?
14 A. Excuse me? Rephrase that.
15 Q. Yeah, I'm trying to understand why you believe
16 Potter says these things to you.
17 A. Why?
18 Q. Yeah. Why?
19 A. I --
20 Q. What's your impression? Is he joking?
21 A. I don't have an impression.
22 Q. Is he hostile?
23 A. I can't tell you why somebody does something. I
24 don't know, sir. I can't answer that. I don't know why he
25 did what he did. I'm sorry, I can't. I don't know what to

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Electronically signed by Jeremy Tieking (501-087-518-8444)    f4927a5a-79e5-479a-8c66-b3976bf91360

Page 169

```
 1   with?
 2        A.  They allowed him to interview me.
 3        Q.  Was that for the -- the captain position in 2019?
 4        A.  Yes, sir.
 5        Q.  Are there any other transfers or promotions that you
 6   allege Potter interfered with?
 7        A.  I thought I requested something else, but I don't
 8   remember what it was now.  I don't remember the other one.  I
 9   think maybe it was an opposite shift or something.  I don't
10   remember what it was.
11        Q.  And I'm referring to allegations that you make in
12   this lawsuit.
13        A.  Yeah.
14        Q.  Are there any other transfer, promotion requests --
15        A.  It's the interview -- I would say that.  It's the
16   interview.
17        Q.  Okay.  So, the only one you're alleging as part of
18   this lawsuit is the captain position that you were seeking in
19   2019?
20        A.  Yes, that I can recall.  Yes, that's the only one.
21        Q.  How many people were on your interview panel?
22        A.  I don't know, five, six maybe.  I think seven, I
23   don't know.
24        Q.  Who were the people on your interview panel?
25        A.  I don't remember.  Me --
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 170

```
 1        Q.  On the panel.
 2        A.  Oh, on the panel, I thought you meant -- sorry.
 3   That's been awhile.
 4        Q.  Let me ask the question again just to make sure that
 5   you understand the question.
 6        A.  How many people were interviewing me?
 7        Q.  How many people were on the pan -- the interview
 8   panel?
 9        A.  Gotcha.
10        Q.  Interviewing you, yes.
11        A.  Gotcha.  Chief Tillman.
12        Q.  Okay.
13        A.  Chief Ball, Chief Potter.  There was one union
14   steward I think that comes.  The EEO lady was there too.
15   Melissa Kleehammer was there.  There was a lady from 230.
16   What's her name?
17        Q.  The EEO lady, Melissa Kleehammer was on the
18   interview panel?
19        A.  Was on the panel, yes.
20        Q.  Okay.
21        A.  Correction.  She was there sitting supposedly to
22   make sure that everything was equal.  She didn't ask me any
23   questions.  She observed, sorry.  So, yes, she was there
24   though.
25        Q.  Okay.
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 171

```
 1        A.  She didn't ask me any questions, but she was there.
 2   And I want to say some lady from one of -- she's up in the
 3   big wig's office over in Carrie Mead's office.  I forgot her
 4   name, I'm so sorry.  She was there.  And then there was a
 5   chief from another department, but he was on the phone, I
 6   think. because they had a separate chief from a different
 7   department.  He was on the phone able to ask questions, so.
 8        Q.  Okay.  So, is it fair to say you don't know everyone
 9   who was on that interview panel?
10        A.  Well, I mean, other than that chief of the phone who
11   was from a different department, I don't know him, but I knew
12   everybody that was there.  Like, I -- I knew them by face and
13   everything, I just don't remember the names right now.
14        Q.  Okay.  Do you know if Adam Todd was on the panel?
15        A.  Chief Todd might have been -- he might have.  I
16   don't remember if he was there.  He might have been on, yes.
17   Usually, it's the assistant chiefs.  The fire chief wasn't
18   in.  Usually, it's the assistant chiefs, one EEO, one person
19   from the union, and one person from up top, so, that --
20   that's all I remember.  Well, the EEO lady was there because
21   before my interview I requested Chief Potter to be removed,
22   and I -- and I told the whole panel, I said listen, I would
23   like to have an individual on this board removed, and I
24   didn't say a name because I didn't have to.  They all knew
25   who it was.  And I wanted to be respectful 'cause -- and I
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Page 172

```
 1   didn't say why, you know what I mean.  I said I'm asking for
 2   an individual to be removed before I start the interview
 3   process 'cause it's unfair because I have an active going --
 4   you know, EEO lawsuit going.  Can you please remove the
 5   individual?  Well, Ms. Kleehammer says business as usual, Mr.
 6   DaSilva.  We don't care.  And I had to sit there and try to
 7   do my best on the interview.
 8        Q.  Okay.  So, do you allege that the EEO official
 9   Melissa Kleehammer discriminated against you?
10        A.  Oh yeah, 100 percent.  Yeah, because when I went to
11   her with Chief Edwards comment to my wife, she said to me
12   well, it only happened once.  Do you really want to follow
13   through up on it?  I'm like really, so yeah, 100 percent.
14        Q.  You don't allege any discrimination by Tillman,
15   Ball, or Todd, do you as part of this lawsuit?
16        A.  No.
17        Q.  Why do you believe that Potter harmed your chances
18   of obtaining the promotion?
19        A.  I just -- the guy was just found guilty of sexual
20   harassment, and now you put him on a panel, how do you think
21   anybody -- any normal human being would be like seriously,
22   you're going to put this man on a panel knowing that there's
23   still a lawsuit, and he -- he was just found guilty of this,
24   and -- and of course, that's just -- I'm sorry.  The question
25   is just insane.  You don't do that.  Any normal human being
```

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

FREE STATE REPORTING, INC.
Court Reporting Transcription

Electronically signed by Jeremy Tieking (501-087-518-8444)    f4927a5a-79e5-479a-8c66-b3976bf91360